**HOSPITAL & HEALTHSYSTEM ASSOCIATION OF PENNSYLVANIA, Pennsylvania Medical Society and Pennsylvania Podiatric Medical Association, Petitioners**

v.

**INSURANCE COMMISSIONER, Respondent.**

Commonwealth Court of Pennsylvania.

Argued March 13, 2012.

Decided Aug. 9, 2013.

---

James W. Abraham, Hummelstown, for petitioner Pennsylvania Podiatric Medical Association.

Philip H. Lebowitz, Philadelphia, for petitioner Hospital & Healthsystem Association of Pennsylvania.

Kevin J. McKeon, Harrisburg, for petitioner Pennsylvania Medical Society.

Terrance A. Keating, Deputy Chief Counsel, Harrisburg, for respondent.

BEFORE: PELLEGRINI, President Judge, McGINLEY, Judge, LEADBETTER, Judge, COHN JUBELIRER, Judge, LEAVITT, Judge, BROBSON, Judge, and McCULLOUGH, Judge.

OPINION BY Judge LEAVITT.[1]

Petitioners [2] are health care providers and trade associations that have petitioned for review of an adjudication of the Insurance Commissioner that denied their challenge to the assessments imposed upon them by the Medical Care Availability and Reduction of Error (MCARE) Fund for the years 2009, 2010 and 2011. These assessments provide the monies used by

---

1. This opinion was reassigned to the authoring judge on March 20, 2013.

2. The petition for review identifies the following as petitioners: Hospital & Healthsystem Association of Pennsylvania, in conjunction with Grand View Hospital, Geisinger Health System, and University of Pittsburgh Medical Center; Pennsylvania Medical Society, in conjunction with Margaret S. Atwell, M.D. and William R. Dewar, III, M.D.; and Pennsylvania Podiatric Medical Association, in conjunction with John Fawcett, D.P.M.

the MCARE Fund to pay medical malpractice claims in excess of what the health care provider's primary insurer pays. Petitioners assert that their assessments were excessive because they resulted in a collection of more monies than were needed by the MCARE Fund to pay claims for one year and provide a 10% reserve. We agree and reverse.

## Background

Since 1975, the Commonwealth has been directly involved in providing medical malpractice insurance to health care providers in Pennsylvania. The Health Care Services Malpractice Act, Act of October 15, 1975, P.L. 390, *as amended,* formerly 40 P.S. §§ 1301.101–1301.1006,[3] was enacted to confront the "medical malpractice crisis," *i.e.,* the unavailability and costliness of medical malpractice insurance, that existed here and in many other jurisdictions at the time. *See McCoy v. Board of Medical Education and Licensure,* 37 Pa. Cmwlth. 530, 391 A.2d 723, 725 (1978). The General Assembly addressed this crisis by establishing a mandatory medical malpractice insurance system and a mandatory arbitration system. Mandatory arbitration was held to be unconstitutional, and that part of the statute was rendered ineffective and unenforceable. *Mattos v. Thompson,* 491 Pa. 385, 421 A.2d 190 (1980). However, the statutory mandate that health care providers purchase medical malpractice insurance withstood a constitutional challenge. *McCoy,* 391 A.2d at 727 (holding that a physician, even one

who had practiced 40 years without a claim of malpractice, could be forced to make this purchase for the first time in his professional life). A health care provider's refusal to purchase malpractice insurance coverage in 1975 was, and continues to be, sanctioned by the provider's loss of his professional license. *Id.* at 728.[4]

Under the 1975 insurance system, each health care provider, physician or hospital, was required to purchase an annual policy of medical malpractice insurance that provided coverage in the amount of $100,000 per occurrence and $300,000 in the aggregate. Section 701(a) of the Health Care Services Malpractice Act, formerly 40 P.S. § 1301.701.[5] Where a health care provider was unable to purchase this primary policy in the private insurance marketplace, the purchase could be made through the assistance of the Joint Underwriting Association. Section 801(a) of the Health Care Services Malpractice Act, formerly 40 P.S. § 1301.801.[6] In addition, each health care provider was required to purchase excess coverage in the amount of $1,000,000 per claim from the "Medical Professional Liability Catastrophe Loss Fund," a special fund in the Pennsylvania Treasury set up to provide excess coverage above the provider's primary coverage. This fund became known as the "CAT Fund." It paid, annually, up to $1,000,000 per occurrence and up to $3,000,000 in the aggregate for each health care provider. Section 701(c) of the Health Care Services Malpractice Act, formerly 40 P.S. § 1301.701(c).[7] The

---

3. The Health Care Services Malpractice Act was repealed by the Act of March 20, 2002, P.L. 154.

4. Technically, the provider can self-insure. Section 711(a)(2) of the Medical Care Availability and Reduction of Error Act, Act of March 20, 2002, P.L. 154, 40 P.S. § 1303.711(a)(2). This option is generally used only by hospital providers.

5. Section 701(a) was repealed by the Act of March 20, 2002, P.L. 154.

6. Section 801 was repealed by the Act of March 20, 2002, P.L. 154.

7. Section 701(c) was repealed by the Act of March 20, 2002, P.L. 154.

CAT Fund was funded by a surcharge upon the premium the provider paid for the primary coverage; the surcharge was set at 10% of the health care provider's annual premium for the primary coverage or $100, whichever was greater. Section 701(d) of the Health Care Services Malpractice Act, formerly 40 P.S. § 1301.701(d).[8]

Over time, the legislature enacted many amendments to the Health Care Services Malpractice Act. Those amendments, *inter alia*, reduced the level of excess coverage provided by the CAT Fund and increased the level of primary coverage required to be purchased by the health care provider. For example, the 1996 amendments made the individual health care provider responsible for primary coverage in the amount of $300,000 per occurrence and $900,000 in the aggregate; the CAT Fund paid the next $900,000 for each occurrence and $2,700,000 in the aggregate.[9] The 1996 amendment also called for continued future increases in the level of primary coverage and decreases in the excess coverage provided by the CAT Fund. *See* Section 3 of the Act of November 26, 1996, P.L. 776. Changes were also made to the CAT Fund surcharge, its amount and calculation. *Id.*

In 2002, the General Assembly repealed the Health Care Services Malpractice Act and started over with new legislation: the Medical Care Availability and Reduction of Error (MCARE) Act.[10] The MCARE Act addressed a newly perceived crisis, *i.e.*, the *cost* of medical malpractice insurance. There was concern that the cost of medical

malpractice insurance in Pennsylvania had increased to the point that physicians educated and trained in Pennsylvania were leaving to set up practice in other states where the costs of this insurance were lower.

Relevant to this case, the MCARE Act abolished the CAT Fund and replaced it with the MCARE Fund. Monies in the CAT Fund were transferred to the MCARE Fund along with the CAT Fund's liabilities. Section 712(b) of the MCARE Act, 40 P.S. § 1303.712(b). Like its predecessor, the MCARE Fund was set up to provide insurance coverage in excess of the mandatory levels of primary medical malpractice coverage. *See* Section 712(a) of the MCARE Act, 40 P.S. § 1303.712(a). For policies issued or renewed in 2002, the first year of the MCARE Act, physicians were required to purchase primary coverage in the amount of $500,000 per occurrence and $1,500,000 in the aggregate; hospitals had to purchase $500,000 per occurrence and $2,500,000 annual aggregate coverage. Section 711(d)(1) of the MCARE Act, 40 P.S. § 1303.711(d)(1). The corresponding coverage from the MCARE Fund for calendar year 2002 for each provider and each hospital was $700,000 per occurrence and $2,100,000 per annual aggregate. Section 712(c)(1) of the MCARE Act, 40 P.S. § 1303.712(c)(1). In 2003, this coverage available from the MCARE Fund dropped to $500,000 per occurrence and $1,500,000 per annual aggregate. Section 712(c)(2)(i) of the MCARE Act, 40 P.S. § 1303.712(c)(2)(i).

**8.** Section 701(d) was repealed by the Act of March 20, 2002, P.L. 154.

**9.** Hospitals had to insure their professional liability in the amount of $300,000 per occurrence and $1,500,000 per annual aggregate. Section 701(a)(1)(i) of the Health Care Services Malpractice Act, formerly 40 P.S.

§ 1301.701(a)(1)(i), repealed by the Act of March 20, 2002, P.L. 154.

**10.** Act of March 20, 2002, P.L. 154, *as amended*, 40 P.S. §§ 1303.101–1303.1115. Sections 1101 through 1115, 40 P.S. §§ 1303.1101–1303.1115, were repealed by the Act of October 9, 2009, P.L. 537.

The MCARE Fund is scheduled for termination. To that end, the MCARE Act has established a schedule for continued increases in the amount of primary coverage that must be purchased by health care providers and continued decreases in the amount of excess coverage that will be available from the MCARE Fund. For example, for policies issued in 2006, the mandatory level of primary medical malpractice coverage was scheduled to increase to $750,000/$2,250,000, and the amount of excess coverage provided by the MCARE Fund was scheduled to drop to $250,000 per occurrence and $750,000 in the aggregate. Sections 711(d)(3)(i), 712(c)(2)(ii) of the MCARE Act, 40 P.S. §§ 1303.711(d)(3)(i), 1303.712(c)(2)(ii). In this way, the MCARE Act provides for a gradual transfer of all medical malpractice insurance coverage, primary and excess, to the private insurance market.

### MCARE Fund Assessments

The MCARE Fund obtains its funding from an annual assessment levied on health care providers. *See* Section 712(d) of the MCARE Act, 40 P.S. § 1303.712(d). Petitioners assert that their MCARE Fund assessments for 2009, 2010 and 2011 were not calculated in accordance with Section 712(d) and, thus, they filed an administrative appeal with the Insurance Commissioner pursuant to Section 712(d)(3) of the MCARE Act, 40 P.S. § 1303.712(d)(3).[11] The evidentiary record was made by stipulation of the parties.

The stipulation describes the MCARE Fund as a "pay-as-you-go" program of insurance. Unlike a private insurance company, it does not establish reserves to cover injuries that occur in the assessment year but do not become adjudicated awards for several years thereafter. *See* Joint Stipulation of Facts, ¶ 8; Reproduced Record at 10a (R.R. ——). *See also Hospital & Healthsystem Association of Pennsylvania v. Commonwealth,* 997 A.2d 392, 394 (Pa.Cmwlth.2010), *appeal filed and probable jurisdiction noted at* 20 MAP 2010. Instead, the MCARE Fund is set up to raise only those funds necessary to "cover claims and expenses for the assessment year." *Id.* The MCARE Fund projects its annual expected claim payments on the basis of the prior year's payments. *Pennsylvania Medical Society v. Department of Public Welfare,* 614 Pa. 574, 581, 39 A.3d 267, 272 (2012). This means that the amount collected from health care providers in a given year may be more, or less, than what is actually needed to pay the MCARE Fund's claims and expenses for that year.

The stipulation provides that the MCARE Fund set the 2009 aggregate assessment total at $204,223,545, *i.e.,* the total amount to be collected from all health care providers to fund one year of operations. This figure was reached by adding together: (1) claims payments for 2008 in the amount of $173,892,874; (2) expenses for the 2008 claim year in the amount of $11,764,894; and (3) 10% of the sum of the preceding two figures, or $18,565,777. Joint Stipulation of Facts, ¶ 14; R.R. 11a. If the claims in 2008 had emptied the MCARE Fund's coffers, it could have borrowed what was needed to cover the shortfall. Section 713(c) of the MCARE Act, 40 P.S. § 1303.713(c). In that case, the 2009 assessment would have been larger because it would also have added the amount of principal and interest payments owing

---

11. Section 712(d)(3) of the MCARE Act states: Any appeal of the [health care provider's] assessment shall be filed with the department.

40 P.S. § 1303.712(d)(3).

on those loans to the aggregate of 2008 claims and expenses, *i.e.,* $185,657,768. Section 712(d)(1)(iii) of the MCARE Act, 40 P.S. § 1303.712(d)(1)(iii).

In making its calculation for 2009, the MCARE Fund ignored its 2008 accrued unspent balance of approximately $104 million. Joint Stipulation of Facts, ¶ 15; R.R. 11a. Likewise, Pricewaterhouse-Coopers, which sets the annual assessment total, did not consider the MCARE Fund's unspent balance when it calculated the assessment totals for 2010 and 2011. Had it done so, the assessments would have been significantly lower. Instead, in 2009, $100 million was transferred out of the MCARE Fund into the Commonwealth's General Fund for the purpose of funding the operations of state government. Section 1717.1–K of the Act of April 9, 1929, P.L. 343 (Fiscal Code), *as amended,* added by the Act of October 9, 2009, P.L. 537, 72 P.S. § 1717.1–K. This Court held that this transfer of funds was illegal. *Hospital & Healthsystem Association,* 997 A.2d at 403. A petition for allowance of appeal of this Court's decision is presently pending before our Supreme Court, with probable jurisdiction noted at 20 MAP 2010.

Petitioners appealed their 2009, 2010 and 2011 assessments on the theory that the MCARE Fund's year-end balance should have been included in the aggregate assessment calculation for 2009 and the following years. The Insurance Commissioner found in favor of the MCARE Fund, concluding that unspent balances in the MCARE Fund were irrelevant to the calculation of the aggregate annual assessment. Petitioners then petitioned for this Court's review.

On appeal,[12] Petitioners argue that the Insurance Commissioner's adjudication cannot be reconciled with the plain language of Section 712(d)(1) of the MCARE Act. They contend that ignoring an unspent balance in the MCARE Fund produces a reserve far in excess of the 10% level set by statute. The dollar amount of the MCARE Fund's reserve will change from year to year but, Petitioners argue, should not exceed 10% of the prior year's claims and expenses. The aggregate assessment must be calculated to achieve that goal.

## Section 712(d)(1) of the MCARE Act

At issue is the meaning of Section 712(d)(1) of the MCARE Act, which establishes the formula by which the MCARE Fund calculates the funds it will need for the following year. It states, in relevant part, as follows:

> For calendar year 2003 and for each year thereafter, the fund shall be funded by an assessment on each participating health care provider. Assessments shall be levied by the department on or after January 1 of each year. *The assessment shall* be based on the prevailing primary premium [13] for each participating

12. When reviewing pure questions of law, this Court exercises *de novo* review that is plenary in scope. *Penneco Oil Co., Inc. v. County of Fayette,* 4 A.3d 722, 724 n. 2 (Pa.Cmwlth. 2010).

13. The "prevailing primary premium" is the premium that the Pennsylvania Professional Liability Joint Underwriting Association (JUA) charges a provider of like specialty and territory under its approved rate schedule. *See* Section 712 of the Act, 40 P.S. § 1303.712;

Joint Stipulation of Facts, ¶ 9; R.R. 10a. The JUA is a statutory facility, made up of all private insurers authorized to write medical malpractice insurance in the Commonwealth, that serves as the insurer of last resort. It provides insurance to health care providers that are unable to obtain medical malpractice insurance in the open market. Section 732 of the MCARE Act, 40 P.S. § 1303.732. Each individual health care provider's assessment is determined by calculating the total annual assessment and, then, dividing it among par-

health care provider and shall, *in the aggregate, produce an amount sufficient to do all of the following:*

 (i) Reimburse the fund for the payment of reported claims which became final during the preceding claims period.

 (ii) Pay expenses of the fund incurred during the preceding claims period.

 (iii) Pay principal and interest on moneys transferred into the fund in accordance with section 713(c) [authorizing the Governor to make loans to the Fund].

 (iv) Provide a reserve that shall be 10% of the sum of subparagraphs (i), (ii) and (iii).

40 P.S. § 1303.712(d)(1) (emphasis added). Simply, the aggregate assessment must be "sufficient" to produce a balance sheet that replaces what was spent in the prior year and provides a reserve of 10%. The dollar amount of the 10% reserve changes from year to year, depending on the prior year's claims and expenses.

The MCARE Fund has construed Section 712(d)(1) to mean that 110% of the prior year's expenditures must be collected each year from health care providers, regardless of the starting balance. Adjudication and Order at 17. This exercise means that unspent balances will accumulate even as claims decline, consistent with the MCARE Fund's scheduled termination, or as earnings on the 10% reserve increase.

Petitioners assert that this is error because, inevitably, this interpretation will lead to an accumulation of unspent balances that is inconsistent with a pay-as-you-go system that was supposed to *reduce* the cost of medical malpractice insurance in Pennsylvania. Most importantly, the MCARE Fund's interpretation distorts the actual language of Section 712(d)(1), as illustrated below:

 The assessment . . . shall, ~~in the aggregate, produce an amount sufficient to do all~~ <u>be equal to the sum</u> of the following:

Joint Brief of Petitioners at 19.[14] If the above-rewrite expresses the legislature's intention, then why did it not use this shorter, and clearer, language? Why, instead, did it use so many additional words, none of which have been given any meaning or effect by the MCARE Fund?

When interpreting a statute, this Court is guided by the Statutory Construction Act of 1972, 1 Pa.C.S. §§ 1501–1991, which provides that "the object of all interpretation and construction of all statutes is to ascertain and effectuate the intention of the General Assembly." 1 Pa.C.S. § 1921(a). "The clearest indication of legislative intent is generally the plain language of a statute." *Walker v. Eleby,* 577 Pa. 104, 123, 842 A.2d 389, 400 (2004). A plain language approach also requires the court to "listen attentively to what a statute says[;] [o]ne must also listen attentively to what it does not say." *Kmonk–Sullivan v. State Farm Mutual Insurance Co.,* 567 Pa. 514, 525, 788 A.2d 955, 962 (2001) (quoting Justice Felix Frankfurter, *Some Reflections on the Reading of Statutes,* 47 Colum. L. Rev. 527, 536 (1947)). Only "[w]hen the words of the statute are not explicit" may this Court resort to statutory construction. 1 Pa.C.S. § 1921(c).

ticipating health care providers. This is done by applying a percentage to the individual provider's "prevailing primary premium." Joint Stipulation of Facts, ¶ 11; R.R. 11a. The assessment rule for 2009 decreased from 20% to 19% of the prevailing primary premium. *Id.* at ¶ 5; R.R. 10a.

**14.** Additions to Section 712(d)(1) are underlined, deletions struck through.

■ The central and dominant phrase in Section 712(d)(1) is that "[t]he assessment . . . shall, in the aggregate, *produce an amount sufficient* to do all of the following [tasks]." 40 P.S. § 1303.712(d)(1) (emphasis added). The words "aggregate" and "amount sufficient to do all of the following" were chosen for a reason. "Aggregate" and "sufficiency" instruct the MCARE Fund to take into account any balance in the MCARE Fund when doing its assessment calculation. The aggregate assessment must leave the MCARE Fund with monies sufficient to pay expenses equal to what was paid in the prior year and with a reserve. That reserve "shall be" 10% of "the sum of" the prior year's claim payments and expenses.

As noted, in construing statutes, courts must be mindful of what the legislature did *not* say. *Kmonk–Sullivan*, 567 Pa. at 525, 788 A.2d at 962. Here, the legislature did *not* say that "the annual assessment shall be equal to the sum of the following four 'sums.'" The legislature did not use the phrase "equal to the sum of" in the critical introduction to Section 712(d)(1), even though that particular phrase appears often in Pennsylvania statutes.[15] The legislature's silence is significant in other ways.

Most importantly, the MCARE Act says nothing about the accumulation of unspent balances in excess of the 10% reserve. It does not authorize them. Accordingly, it provides no direction on when and how to use them. Likewise, the MCARE Act provides no guidance on the income generated by an accumulation of unspent balances, which can be considerable given the present unspent balance of $104 million. The MCARE Act's silence on these matters makes perfect sense only if the legislature never intended that such an accumulation would develop.

The legislature has addressed the possibility of an unspent balance in only one place in the statute. Section 712(k) of the MCARE Act provides that upon termination of the MCARE Fund, "[a]ny balance remaining in the fund" shall be returned to the healthcare providers who paid "assessments *in the preceding calendar year.*" 40 P.S. § 1303.712(k) (emphasis added). The very wording of this directive is instructive. It presumes a small, if "any," balance and suggests that there should not be an unspent balance in any other year. Were it otherwise, the legislature would have directed the return of accumulated unspent balances to all the providers who, in preceding years, contributed to the accumulated unspent balances lest the providers in the final year enjoy a windfall.

■ Assuming, *arguendo*, that the legislature intended the MCARE Fund to accumulate unspent balances, then Section 712(d) is constitutionally infirm because it did not give the MCARE Fund any direction on how to use such unspent balances. An agency's authority must be limited and guided by statutory standards. *MCT Transportation, Inc. v. Philadelphia Parking Authority*, 60 A.3d 899, 904–05 (Pa.Cmwlth.2013). The General Assembly may not delegate its legislative authority to an agency; it must make the basic policy choices. The basic policy choices have not been made for how to use a multi-

---

15. *See, e.g.,* Section 503(e)(1), (2) of the Act of June 27, 2006, P.L. 1873, 53 P.S. § 6926.503(e)(1), (2) ("sum of all of the following"); 24 Pa.C.S. § 8342(a) ("equal to the sum of the following"); Section 2509.6(b) of the Act of March 10, 1949, P.L. 30, added by the Act of August 5, 1991, P.L. 219, *as amend-* ed, 24 P.S. § 25–2509.6(b) ("dollars available . . . shall be the sum of the following"); and Section 2502.48(b) of the Act of March 10, 1949, P.L. 30, added by the Act of July 9, 2008, P.L. 846, *as amended,* 24 P.S. § 25–2502.48(b) (determine "adequacy target . . . by calculating the sum of the following").

year accumulation of large unspent balances because the legislature did not intend that they be created.

The MCARE Act states that the MCARE Fund's reserve "shall be" 10% of the prior year's claims and expenses. Instead, after the 2009 assessment, the MCARE Fund had a reserve of 64%.[16] This result cannot be squared with the stated purposes of the MCARE Act or the precise wording of Section 712(d)(1).

### MCARE Fund's Construction of Section 712(d)

The MCARE Fund argues for a construction of Section 712(d) that it believes will serve the public interest. First, it argues that its construction will promote stability in annual assessments, noting that MCARE Fund assessments have been adding approximately 18% to 21% to a health care provider's prevailing primary premium. Second, it offers potential uses for the unspent balances in the MCARE Fund. They can be used (1) to pay claims in a year that the 10% reserve is exhausted and (2) to reduce provider assessments when the MCARE Fund phase-out is implemented. These suggested uses of the unspent balances may be good ideas, but they are not provided in the MCARE Act.

To begin with, the legislature has anticipated the possibility of a year where claims and expenses run through the MCARE Fund's reserve. To meet the possibility, the legislature has authorized the MCARE Fund to borrow funds. Section 713(c) of the MCARE Act, 40 P.S. § 1303.713(c). That is why the repayment of loans has been made part of the annual aggregate assessment calculation.

The MCARE Fund's assertion that its construction achieves stability in annual assessments misses the mark. Stability is not a value expressed in the MCARE Act, but a reduction in the cost of medical malpractice insurance is an expressed value. "Stability," in theory, would justify an assessment that never declined even as the MCARE Fund's annual expenses dramatically declined. Stable, unchanging assessments hold no logic for a statutory fund scheduled for ever reducing liabilities. In this context, "stability" is just another word for "excessive."

The MCARE Fund points to a 1975 version of the surcharge provision in the repealed Health Care Services Malpractice Act. A survey of "prior iterations of an act" may shed light on legislative intent. *PECO Energy Co. v. Pennsylvania Public Utility Commission*, 568 Pa. 39, 47, 791 A.2d 1155, 1160 (2002).[17] The MCARE Fund believes that this survey supports its construction of Section 712(d)(1).

The CAT Fund was funded by provider surcharges that were calculated as follows:

---

**16.** The 2009 aggregate assessment was calculated to be $204 million. This consisted of 2008 claims and expenses (approximately $185 million) plus 10% (approximately $18.5 million). The MCARE Fund sought these funds even as it projected a $100 million surplus. Joint Stipulation of Facts, ¶ 13; R.R. 11a. The actual reserve established by this assessment was $118.5 million (this was the $100 million in the MCARE Fund plus the $18.5 million collected in 2009). This sets a reserve of 64% ($118.5 million/$185 million) of the 2008 expenses. A 10% reserve is $18.5 million. Thus, the 2009 assessment collected $100 million more than needed.

**17.** "The former law, if any, including other statutes upon the same or similar subjects" is an appropriate tool in ascertaining legislative intent. 1 Pa.C.S. § 1921(c)(5). Changes in statutory language ordinarily indicate a change in legislative intent. *Masland v. Bachman*, 473 Pa. 280, 374 A.2d 517 (1977); *WRC North Fork Heights, Inc. v. Board of Assessment Appeals*, 917 A.2d 893, 906 n. 13 (Pa.Cmwlth.2007).

The surcharge shall be based on the cost to each health care provider for maintenance of the professional liability insurance and shall be the appropriate percentage thereof, *necessary to produce an amount sufficient to reimburse the fund for the payment of all claims paid and expenses incurred during the preceding calendar year and to provide an amount necessary to maintain an additional $15,000,000.*

Section 701(e)(1) of the Health Care Services Malpractice Act, formerly 40 P.S. § 1301.701(e)(1) (emphasis added).[18] Litigation ensued on whether the "additional $15,000,000" was intended as a floor or ceiling on the CAT Fund balance. In *Meier v. Maleski*, 670 A.2d 755 (Pa.Cmwlth. 1996), this Court concluded that this statutory provision was ambiguous. In 1975, former Section 701(d) had provided:

If the total fund exceeds the sum of $15,000,000 at the end of any calendar year after the payment of all claims and expenses, including the expenses of operation of the office of the director, the director shall reduce the surcharge provided in this section in order to maintain the fund at an approximate level of $15,000,000.

Formerly 40 P.S. § 1301.701(d). Reading Section 701(d) and Section 701(e)(1) together meant that the "additional $15,000,000" was the maximum surplus. However, in 1980 Section 701(d) was re-

pealed.[19] Noting that a change in language indicates a change in legislative intent, this Court opined as follows:

The 1980 amendments clearly eliminated the previously existing $15,000,000 cap and accompanying surcharge reduction requirement. If, as Petitioners claim, the General Assembly intended that this [surcharge] reduction obligation remain, no alteration would have been necessary. Thus, we must conclude that the material changes in the provision evidence a clear legislative intent to abolish the statutory cap.

*Meier*, 670 A.2d at 760 (footnote omitted). Accordingly, we construed the language in Section 701(d) "to maintain an additional $15,000,000" to provide a floor, not a ceiling. The holding in *Meier* is not dispositive of the meaning of Section 712(d)(1) for several reasons.

When first enacted, the Health Care Services Malpractice Act calculated the surcharges at issue in Section 701(d) by using "actuarial principles." In 1980, however, the legislature repealed that system and replaced it with a "pay-as-you-go" system. In that context, Section 701(d) was amended to require the CAT Fund to "maintain an additional $15,000,000." Then in 1996, after *Meier* was decided, the legislature amended Section 701(d) to replace the language for "an additional $15 million" to "an additional 15% of the [prior year's] final claims and expenses."[20] This

---

**18.** Section 701(e)(1) was repealed by the Act of March 20, 2002, P.L. 154.

**19.** The 1975 version of Section 701(d) was repealed by Section 3 of the Act of October 16, 1980, P.L. 971; the 1980 version of Section 701(d) was repealed by the Act of March 20, 2002, P.L. 154. The 1980 version of Section 701(d) allowed the CAT Fund to do an emergency surcharge in the event the CAT Fund was at risk of exhausting its funds.

**20.** The 1996 amendments to Section 701(e)(1) of the Health Care Services Malpractice Act provided, in relevant part, as follows:

The surcharge shall be based on the ~~cost to~~ prevailing primary premium for each health care provider for maintenance of professional liability insurance and shall be the appropriate percentage thereof, necessary to produce an amount sufficient to reimburse the fund for the payment of ~~all claims paid~~ final claims and expenses incurred during the preceding ~~calendar year~~

final change to Section 701(d) connected the "additional" component of the surcharge to the CAT Fund's actual expenses.

Section 701(d), along with the rest of the Health Care Services Malpractice Act, has been repealed. In 2002, the legislature hit the restart button by enacting a new law. Although the MCARE Act has retained some features of the prior system, it instituted a new regime. It replaced Section 701(d) with a new approach and new language.

Section 712(d)(1), unlike the prior surcharge provision for the CAT Fund, begins with the aggregate annual assessment. It directs that the annual aggregate assessment be "sufficient" to create a balance sheet that will cover the four listed items: claims, expenses, debt repayment and a reserve. In this scheme, a "reduction" is an unnecessary and illogical exercise. Further, Section 712(d)(1) uses new terminology. The "surcharge" is gone and has been replaced with an "assessment." Maintenance of "an additional 15%" is gone. The new directive in Section 712(d)(1) is that the MCARE Fund "shall" have "a reserve" of 10%. Section 712(d)(1) does not say "reserves" or "annual reserve." In short, the mandate for "a 10% reserve" set the floor and the ceiling, eliminating the ambiguity perceived in *Meier*.[21]

The MCARE Fund's reliance upon the 1975 version of Section 701(d), repealed in 1980, is, thus, unpersuasive. First, it does not account for the several iterations of Section 701(d) nor does it account for the new approach and terminology used in the MCARE Act. Second, it is ironic. The MCARE Fund itself argues that the accumulated unspent balances should be used to "reduce" provider assessments, but at an uncertain point in the future of its choosing.

The aggregate assessment must raise funds "sufficient" to meet the specified purposes in Section 712(d)(1). This means that the MCARE Fund must begin its annual aggregate assessment calculation with its unspent balance and add to it the amounts "sufficient" to cover the prior year's claims and expenses and to "provide a 10% reserve." Instead, the MCARE Fund's calculation has provided a 64% reserve.

As noted, 712(k) of the MCARE Act has slated the MCARE Fund for extinction. It states that "[a]ny balance remaining in the fund upon such termination shall be returned by the department to the participating health care providers that participated in the fund in proportion to their assessments *in the preceding calendar year.*" 40 P.S. § 1303.712(k) (emphasis added). The inequity of refunding an accumulated balance in the MCARE Fund in the year of termination only to those health care providers that participated in the preceding year's assessment (and perhaps *only* in the preceding year, if it was a provider's first year of practice in the Commonwealth) is obvious. *See* 1 Pa.C.S. § 1922(1) (noting that we must presume that General Assembly does not intend a result that is absurd or unreasonable).

---

claims period and to provide an amount necessary to maintain an additional $15,000,000. 15% of the final claims and expenses incurred during the preceding claims period.
Section 3 of the Act of November 26, 1996, P.L. 776 (additions underlined, deletions struck through).

21. Further, by reducing the CAT Fund era percentage of 15% to a "10% reserve," the legislature expressed the view that a reserve in the MCARE Fund of 15% would be too high. The MCARE Fund construction of Section 712(d)(1) makes the 10% reserve a meaningless number.

The fact that the General Assembly chose to limit distribution of any balance in the MCARE Fund at termination to those that participated in the Fund in the *preceding* calendar year indicates that the legislature intended a direct correlation between the *actual* MCARE Fund balance at termination and the population of providers assessed in the prior year.

We reject the MCARE Fund's proffered policy and statutory construction arguments offered to support its construction of Section 712(d)(1) of the MCARE Act.

## Conclusion

Our interpretation of Section 712(d)(1) of the MCARE Act realizes the expressly stated legislative goals of the Act, *i.e.*, creating a health care system that provides for *affordable* professional liability insurance.[22] Requiring health care providers to fund a new 10% reserve every assessment year, without regard to the monies already held by the MCARE Fund, undermines that goal. Such an approach repeatedly and needlessly charges participating providers an assessment in excess of what is necessary to fund the statutorily-required 10% reserve. It creates a separate off-balance sheet fund within the MCARE Fund, without benefit to the providers and without explicit legislative authority. Because the population of providers changes over time, the providers who enter such a system in the earlier years will end up subsidizing the participating providers in the later years. This is unfairly discriminatory.

For all of the foregoing reasons, we reverse the order of the Insurance Commissioner and remand this matter to the Commissioner to recalculate the MCARE assessments for 2009, 2010 and 2011 in accordance with this opinion.

## ORDER

AND NOW, this 9th day of August, 2013, the order of the Insurance Commissioner in the above-captioned matter, dated May 6, 2011, is REVERSED and the matter is REMANDED to the Commissioner to recalculate the assessments levied under the Medical Care Availability and Reduction of Error Act, Act of March 20, 2002, P.L. 154, *as amended*, 40 P.S. §§ 1303.101–1303.1115, for the years 2009, 2010, and 2011 in accordance with the attached opinion.

Jurisdiction relinquished.

## DISSENTING OPINION BY Judge LEADBETTER.

I must respectfully dissent because I agree with the Commissioner's construction and application of Section 712(d) of the Act,[1] 40 P.S. § 1303.712(d). The assessment formula set forth therein is explicit. The statute plainly mandates that the *assessment* shall produce the amount necessary to cover the itemized factors, not that after the assessments the fund shall be sufficient to cover them. As written, it clearly does not expressly require consideration or inclusion of the Fund's prior year-end balance in calculating the reserve or the total amount to be assessed. Such consideration is also not implicitly required by the statutory language. Because future claims and expenses are not known, the statutory scheme predicts the funds anticipated to be needed for the upcoming year based upon the preceding year's experience and provides for an additional 10% buffer or reserve to cover unanticipated claims or expenses that exceed

---

22. Section 102 of the Act of March 20, 2002, P.L. 154, *as amended*, 40 P.S. § 1303.102.

1. Act of March 20, 2002, P.L. 154, *as amended*.

the previous year's figures. Thus, the annual assessment calculation is, as the Commissioner contends, the sum of the previous year's claims and expenses, any principal and interest due, and 10% of the sum of the three aforesaid amounts. There simply is no mention of the Fund's year-end balance in the assessment formula and such consideration would be contrary to the language of Section 712(d).

The purpose of Section 712(d) is to calculate the amount of the annual assessment to be imposed, which has legislatively been determined to be 110% of the prior year's expenditures. Section 712(d) simply does not relate to or pertain to the Fund's accumulated balance; nor does Section 712(d) provide any authority to the Department or its agents to manage or address the Fund's balance in the context of calculating the annual aggregate assessments to be collected from providers.

I also believe that this construction is consistent with both precedent and legislative history. A similar issue arose under the former statutory scheme involving the Health Care Services Malpractice Act[2] (former Act) and the Medical Professional Liability Catastrophe Loss Fund (commonly referred to as the CAT Fund). Similar to the current scheme, one of the primary purposes of the CAT Fund was to assure the availability of reasonably priced professional liability insurance for Pennsylvania health care providers. *See Meier, M.D. v. Maleski,* 670 A.2d 755, 756 n. 2 (Pa.Cmwlth.1996), *aff'd without op.,* 549 Pa. 171, 700 A.2d 1262 (1997) [citing Section 102, 40 P.S. § 1301.102 (repealed)]. The former CAT Fund provided additional liability insurance coverage above the basic insurance coverage limits and was funded by, *inter alia,* annual surcharges levied on

health care providers. *Id.* [citing Section 701(d), (e) and (f), 40 P.S. § 1301.701(d), (e), and (f) (repealed)]. Surcharges were calculated pursuant to Section 701(e)(1) of the former Act, which stated:

> The fund shall be funded by the levying of an annual surcharge on or after January 1 of every year on all health care providers entitled to participate in the fund. The surcharge shall be determined by the director.... The surcharge shall be based on the cost to each health care provider for maintenance of the professional liability insurance and shall be the appropriate percentage thereof, *necessary to produce an amount sufficient to reimburse the fund for the payment of all claims paid and expenses incurred during the preceding calendar year and to provide an amount necessary to maintain an additional $15,000,000.*

40 P.S. § 1301.701(e)(1) (emphasis added). Litigation ensued regarding whether the $15 million surplus provision set forth above was intended as a floor or ceiling on the CAT Fund balance. According to the health care provider petitioners, former Section 701(e)(1) mandated that any CAT Fund balance exceeding the $15 million cap should be applied to reduce the surcharge for the upcoming year. *See Meier,* 670 A.2d at 757. Similar to Petitioners here, the *Meier* petitioners argued that the statutory provision authorized the Fund to collect only enough to pay claims and expenses and maintain a $15 million fund balance, nothing more. This court concluded that the provision was ambiguous regarding whether the $15 million was intended to be a minimum or maximum and turned, in part, to legislative history to resolve the issue. The court noted that as

**2.** Act of October 15, 1975, P.L. 390, *as amended,* 40 P.S. §§ 1301.101–1301.1004, re-pealed by the Act of March 20, 2002, P.L. 154.

originally enacted in 1975, former Section 701(d) provided:

> If the total fund exceeds the sum of $15,000,000 at the end of any calendar year after the payment of all claims and expenses, including the expenses of operation of the office of the director, the director shall reduce the surcharge provided in this section in order to maintain the fund at an approximate level of $15,000,000.

40 P.S. § 1301.701(d) (subsequently amended in part in 1980 and then repealed). In 1980, the surcharge reduction requirement was deleted and the director was given the authority to levy an emergency surcharge should the fund be exhausted through payment of all claims and expenses. Section 701(3), 40 P.S. § 1301.701(e)(3) (repealed). Noting that a change in language indicates a change in legislative intent, the court opined:

> [T]he legislative history ... resolves any question of the meaning of section 701(e)(1) in favor of the [Commonwealth] Respondents' interpretation. The 1980 amendments clearly eliminated the previously existing $15,000,000 cap and accompanying surcharge reduction requirement. If, as Petitioners claim, the General Assembly intended that this reduction obligation remain, no alteration would have been necessary. Thus, we must conclude that the material changes in the provision evidence a clear legislative intent to abolish the statutory cap.

*Meier*, 670 A.2d at 760 (footnote omitted).[3]

In light of the language chosen by the General Assembly in originally enacting former Section 701(d), the subsequent amendment in 1980 to remove the surcharge reduction provision and our reported opinion in *Meier* analyzing the import of the statutory change, I conclude that had the General Assembly intended the present MCARE Fund's year-end balance to be factored into the assessment calculation, it would have expressly done so in crafting Section 712(d).

Accordingly, I would affirm.

President Judge PELLEGRINI joins in this dissenting opinion.

CONCURRING OPINION BY Judge BROBSON.

Because I believe that the adjudication of the Pennsylvania Insurance Commissioner (Commissioner) in this matter is at odds with the governing statutory language, the Commissioner's adjudication must be reversed with a majority opinion that provides a path forward if this Court's decision becomes the final word on this matter. It is for this reason that I join the majority opinion. I write separately only to offer an alternative construction of the governing statutory language that would also support reversal, but would provide for a different method of calculating assessments than that laid out by the majority.

Section 712 of the Medical Care Availability and Reduction of Error (MCARE) Act (Act)[1] establishes the MCARE Fund. To evaluate the General Assembly's intent in one subsection of Section 712 requires the consideration of the entire section, if not the entire Act. *See* 1 Pa.C.S. § 1921(a); *Snyder v. Com., Dep't of Transp.*, 64 Pa. Cmwlth. 599, 441 A.2d 494, 496 (1982)

---

**3.** The court's conclusion was further bolstered by a Committee Report which recommended removal of the cap in order to allow the CAT Fund to accumulate more money in order to prevent sudden large surcharges.

**1.** Section 712 of the Act, Act of March 20, 2002, P.L. 154, *as amended*, 40 P.S. § 1303.712.

("[S]ections of a statute must be construed with reference to the entire statute and not apart from their context.").

In context, Section 712 of the Act provides that monies in the MCARE Fund "shall be used to pay claims against participating health care providers for losses or damages awarded in medical professional liability actions against them in excess of" the statutorily-required basic professional liability insurance coverage. Section 712(a) of the Act. Section 712 also provides that those very same participating providers are to fund the MCARE Fund through annual assessments. Section 712(d) of the Act.[2]

The annual assessments are "based on the prevailing primary premium for each participating health care provider"[3]— meaning, the assessment is a multiplier that, when applied to a particular health care provider's prevailing primary premium, yields the amount of that health care provider's annual assessment. Health care providers pay this annual assessment *in addition to* their annual medical malpractice insurance premium.

In order to determine the appropriate multiplier, the Pennsylvania Insurance

2. Section 712(a) and (d) of the Act provide:

 (a) **Establishment.**—There is hereby established within the State Treasury a special fund to be known as the Medical Care Availability and Reduction of Error Fund. Money in the fund shall be used to pay claims against participating health care providers for losses or damages awarded in medical professional liability actions against them in excess of the basic insurance coverage required by section 711(d), liabilities transferred in accordance with subsection (b) and for the administration of the fund.

 . . . .

 (d) **Assessments.**—
 (1) For calendar year 2003 and for each year thereafter, the fund shall be funded by an assessment on each participating health care provider. Assessments shall be levied by the department on or after January 1 of each year. The assessment shall be based on the prevailing primary premium for each participating health care provider and shall, in the aggregate, produce an amount sufficient to do all of the following:
 (i) Reimburse the fund for the payment of reported claims which became final during the preceding claims period.
 (ii) Pay expenses of the fund incurred during the preceding claims period.
 (iii) Pay principal and interest on moneys transferred into the fund in accordance with section 713(c).
 (iv) Provide a reserve that shall be 10% of the sum of subparagraphs (i), (ii) and (iii).

 (2) The department shall notify all basic insurance coverage insurers and self-insured participating health care providers of the assessment by November 1 for the succeeding calendar year.
 (3) Any appeal of the assessment shall be filed with the department.
 (Footnotes omitted.) Also relevant for purposes of analyzing the issue in this case is Section 712(k) of the Act, which provides:
 (k) **Termination.**—Upon satisfaction of all liabilities of the fund, the fund shall terminate. Any balance remaining in the fund upon such termination shall be returned by the department to the participating health care providers who participated in the fund in proportion to their assessments in the preceding calendar year.

3. "Prevailing primary premium" is the premium rate associated with a particular health care provider for an occurrence policy issued by the Pennsylvania Professional Liability Joint Underwriting Association (JUA). Section 702 of the Act, Act of March 20, 2002, P.L. 154, *as amended,* 40 P.S. § 1303.702. The JUA is a statutory insurance pool, made up of all insurers authorized to write medical malpractice insurance in the Commonwealth. The JUA serves as the insurer of last resort for health care providers who are unable to secure their liability insurance in the open market at prevailing rates. Section 732 of the Act, Act of March 20, 2002, P.L. 154, *as amended,* 40 P.S. § 1303.732.

Department (Department) must first determine the total amount of funds to be generated by the assessment. Again, in context, at issue is the maintenance and operation of the MCARE Fund. The MCARE Fund pays claims on a "pay-as-you-go" basis, meaning that the MCARE Fund does not build into its assessment scheme an actuarial assessment of incurred but not reported or reported but unresolved claims, as most private insurers do and are required to do by law. Instead, the Department assesses the annual needs of the MCARE Fund based on the expenses of the MCARE Fund in the year immediately preceding.

This brings me to Section 712(d)(1) of the Act. It provides, in relevant part:

The assessment ... shall, in the aggregate, *produce an amount sufficient* to do all of the following:

(i) Reimburse the fund for the payment of reported claims which became final during the preceding claims period.

(ii) Pay expenses of the fund incurred during the preceding claims period.

(iii) Pay principal and interest on moneys transferred into the fund in accordance with section 713(c).[4]

(iv) *Provide a reserve that shall be 10% of the sum of subparagraph (i), (ii), and (iii).*

(Emphasis added.) Subparagraphs (i), (ii), and (iii) are clearly intended as reimbursement/payment devices. They are meant to replenish the MCARE Fund for claims

and expenses actually paid in the prior year and to pay off loan obligations actually incurred in the prior year. Thus, the assessment must include "sufficient" monies to restore the MCARE Fund balance to where it would have been had none of these claims and expenses been paid and as if the loan/transfer of funds had not occurred. This is in keeping with the MCARE Fund's "pay-as-you-go" system.

But subparagraph (iv) is different. That subparagraph speaks in terms of providing for a "reserve." The General Assembly's use of the term "reserve" is telling.[5] The General Assembly's use of the concept of a "reserve" could reasonably be interpreted as referring not to the assessment in isolation, but rather to an assumption or anticipation that current year expenses and liabilities for the MCARE Fund would be 10% higher than the prior year. Thus, the General Assembly may have wanted to ensure that there is an additional amount of money *in the MCARE Fund*—a reserve—"sufficient" to pay for this assumed or anticipated additional obligation.

To ensure that there is a "10% reserve," the General Assembly may have intended that the Department look to the MCARE Fund balance at the end of the year immediately preceding, in order to determine the "amount sufficient" to "[p]rovide a reserve that shall be 10% of the sum of subparagraphs (i), (ii) and (iii)." By the chosen statutory language, the General Assembly may have intended that the MCARE Fund reserve in the current year be capped at 10% of the MCARE Fund's

---

4. Section 713(c) of the Act authorizes the Governor to transfer money into the MCARE Fund if the MCARE Fund lacks sufficient monies to pay its liabilities. Section 713(c) of the Act, Act of March 20, 2002, P.L. 154, *as amended,* 40 P.S. § 1303.713(c). Such transfers are treated as loans, and must be paid back with interest. *Id.*

5. In the insurance industry, a "reserve" is defined as "[s]ums of money an insurer is required to set aside as a fund for the liquidation of future unaccrued and contingent claims, and claims accrued, but contingent and indefinite as to amount." Black's Law Dictionary 1308–09 (6th ed. 1990).

expenses and liabilities from the year immediately preceding. I reach this conclusion because of the General Assembly's use of the phrase "shall be 10%" in reference to the reserve. If the General Assembly had intended the 10% reserve to be only a *floor*, it would have chosen different language—*e.g.* "shall be *at least* 10%." Moreover, if there is a balance in the prior year, failure to account for that balance would produce an assessment that is *excessive*, in that it could "provide a reserve" *in excess of 10%.*

This alternative interpretation of Section 712(d)(1) of the Act furthers one of the expressly stated legislative goals of the Act—*i.e.*, creating a health care system that provides for accessible *and affordable* professional liability insurance.[6] Requiring health care providers to fund a 10% reserve every assessment year, without regard to the monies already held in reserve by the MCARE Fund, does nothing to make professional liability insurance affordable in the Commonwealth.

Finally, Section 712(k) of the Act supports this alternative interpretation. This provision anticipates the future termination of the MCARE Fund. On that day, "[a]ny balance remaining in the fund upon such termination shall be returned by the department to the participating health care providers who participated in the fund in proportion to their assessments *in the preceding calendar year.*" (Emphasis added.) The Commissioner adopted an interpretation of Section 712(d)(1) that could create, and has created, a substantial reserve in the MCARE Fund over a period of *many* years. Under this interpretation, the inequity and absurdity of only refunding the balance in the MCARE Fund in the year of termination to those health care providers who participated in the MCARE Fund in the preceding year (and

perhaps *only* in the preceding year, meaning it was the health care provider's first year of practice in the Commonwealth) is obvious. *See* 1 Pa.C.S. § 1922(1) (noting that we must presume that General Assembly does not intend a result that is absurd or unreasonable).

The fact that the General Assembly chose to limit distribution of any balance in the MCARE Fund at termination to those who participated in the MCARE Fund in the preceding calendar year also supports a conclusion that the General Assembly intended and envisioned a direct correlation between the *actual* MCARE Fund balance at termination and those assessed in the prior year. This alternative interpretation of Section 712(d)(1) of the Act, requiring only an assessment of an amount sufficient to provide for a 10% reserve in the MCARE Fund and nothing more, is consistent with this scheme.

Judge COHN JUBELIRER joins in this concurring opinion.

---

**6.** Section 102 of the Act, Act of March 20, 2002, P.L. 154, *as amended*, 40 P.S. § 102.