77 A.3d 587

The HOSPITAL & HEALTHSYSTEM ASSOCIATION OF PENNSYLVANIA, Geisinger Health System, St. Vincent Health Center and Abington Memorial Hospital

v.

The COMMONWEALTH of Pennsylvania, The Department of Insurance, The Treasury Department, and The Office of the Budget of the Commonwealth of Pennsylvania.

Appeal of Commonwealth of Pennsylvania, The Department of Insurance and The Office of the Budget of the Commonwealth of Pennsylvania.

The Pennsylvania Medical Society, on behalf of itself and all of its Members

v.

The Commonwealth of Pennsylvania; The Department of Insurance, The Treasury Department, and The Office of the Budget of the Commonwealth of Pennsylvania.

Appeal of Commonwealth of Pennsylvania, The Department of Insurance and The Office of the Budget of the Commonwealth of Pennsylvania.

Supreme Court of Pennsylvania.

Argued Sept. 14, 2011.

Decided Sept. 26, 2013.

262 

Jonathan F. Bloom, Esq., Philadelphia, Thomas Walter Dymek, Esq., Harrisburg, Karl Stewart Myers, Esq., Philadelphia, Stradley, Ronon, Stevens & Young, L.L.P., for The Senate of the Commonwealth of PA, Amicus Curiae.

Christopher B. Craig, Esq., Harrisburg, Karen Spencer Kelly, Esq., Philadelphia, PA Department of Treasury, for Treasury Department, Participants.

Kevin James McKeon, Esq., Scott Thomas Wyland, Esq., Hawke McKeon & Sniscak, L.L.P., Harrisburg, for PA Medical Society, Peter Daloni, M.D., Martin Trichtinger, M.D., Participants.

Amy Griffith Daubert, Esq., Harrisburg, PA Department of Insurance, for Department of Insurance.

Gregory Eugene Dunlap, Esq., PA Office of General Counsel, for Commonwealth of PA, Dept. of Insurance, Office of the Budget of the Commonwealth.

Barbara J. Holland, Esq., Robert L. Pratter, PA Governor's Office of General Counsel, Kathleen Granahan Kane, Esq., PA Office of Attorney General, for Commonwealth of Pennsylvania.

James Daniel Neilson, Esq., PA Governor's Office of General Counsel, for Office of the Budget of the Commonwealth of Pennsylvania.

Tara Lynn Smith, Esq., PA House of Representatives, Nora Winkelman, Esq., for Rep. Todd A. Eachus, Majority Leader of the PA House of Rep., Appellant Amicus Curiae.

Philip H. Lebowitz, Esq., David Edwin Loder, Esq., Philadelphia, Nina L. Russakoff, Esq., Duane Morris, L.L.P., for Hospital & Healthsystem Assoc of PA, Geisinger Healthsystem, St. Vincent Health Ctr., Abington Memor.

Robert B. Hoffman, Esq., Eckert Seamans Cherin & Mellott, LLC, Harrisburg, for American Medical Association, Appellee Amicus Curiae.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, ORIE MELVIN, JJ.

## *OPINION*

Justice SAYLOR.[1]

In this direct appeal, we determine the constitutionality of legislation mandating a one-time transfer of money from the Medical Care Availability and Reduction of Error Fund to Pennsylvania's General Fund.

### I. Background

In 2002, the General Assembly enacted the Medical Care Availability and Reduction of Error Act (the "MCARE Act"),[2] which requires health care providers to maintain a minimum level of professional liability insurance. The MCARE Act also created the Medical Care Availability and Reduction of Error Fund (the "MCARE Fund"), which is designated as a "special fund" within the state treasury. 40 P.S. § 1303.712(a). The MCARE Fund is administered by the Insurance Department of Pennsylvania. *See id.* § 1303.713(a).

1. This case was reassigned to this author.

2. Act of Mar. 20, 2002, P.L. 154, No. 13 (as amended 40 P.S. §§ 1303.101–1303.1115).

Under the MCARE Act, Pennsylvania physicians, hospitals, and certain other health care providers, as a condition of practicing in Pennsylvania, are required to purchase medical professional liability insurance (or provide self-insurance) in the amount of $500,000 per occurrence or claim, and to participate in the MCARE Fund. *See* 40 P.S. § 1303.711(a), (d)(2), (e). The MCARE Fund provides a secondary layer of liability coverage to providers by paying, subject to the fund's liability limits, damages awarded in medical malpractice actions in excess of the required minimum level of professional liability coverage. *See id.* § 1303.711(g). Presently, the fund's liability limit is $500,000 per occurrence. *See id.* § 1303.712(c). The MCARE Fund is funded by annual assessments levied upon health care providers based on a statutory formula, and loans secured, when needed, from other state funds, such as the Catastrophic Loss Benefits Continuation Fund. *See id.* §§ 1303.712(d), 1303.713(c).[3]

Although the MCARE Fund is similar to a supplemental insurance carrier, there are differences, the main one for present purposes being that there is no risk transfer in exchange for premiums. Rather, the statutory formula for assessments levied against health care providers is designed to: (i) reimburse the fund for the payment of reported claims that became final during the preceding year; (ii) pay expenses of the fund incurred during the preceding year; (iii) pay principal and interest on monies that the fund borrowed; and (iv) create a reserve that is ten percent of the sum of (i)-(iii) above. *See* 40 P.S. § 1303.712(d). At any time there may be unfunded liability arising from unreported or unresolved claims. If and when the Insurance Commissioner determines that the private insurance market has the capacity to satisfy professional liability requirements, the MCARE Fund will cease providing coverage for new liability. *See id.* §§ 1303.712(c)(2), 1303.711(d)(4). The fund will not immedi-

---

3. At the time MCARE became law, the MCARE Fund was also funded by surcharges on motor vehicle violations. *See* 75 Pa.C.S. § 6506(b) (repealed). That provision was repealed by the Act of June 30, 2011, P.L. 159, No. 26, § 13. Vehicle surcharges are now deposited in the Commonwealth's General Fund. *See id.* § 9; 72 P.S. § 1798–E.

ately terminate, however, as it will still be responsible for excess coverage on unreported or unresolved claims stemming from events that occurred during coverage years. Because assessments are based on the claims paid in the prior year, the MCARE Fund will continue to collect assessments until all claims for which it is responsible have been satisfied. The fund's actuaries have projected that it may continue to pay claims—and thus, collect assessments—for forty years after the fund ceases to provide coverage. At that time, monies remaining in the fund are to be distributed to health care providers in proportion to their assessments during the preceding year. *See id.* § 1303.712(k).

Due to a revenue shortfall, the Commonwealth faced a budget impasse for the 2009–10 fiscal year that lasted approximately 100 days. An interim budget was passed in early August of 2009, and the impasse was finally resolved on October 9, 2009, when the Governor approved a supplemental appropriations bill, as well as implementing legislation making amendments to Pennsylvania's Fiscal Code.[4] *See* Act of Oct. 9, 2009, P.L. 537, No. 50 ("Act 50"). One of Act 50's provisions designed to balance the budget directed that $100 million be transferred from the MCARE Fund to the General Fund. *See* 72 P.S. § 1717.1–K(1).[5] That provision is at the center of this case.

On October 13, 2009, Appellees filed petitions for review in the nature of complaints for declaratory judgment and injunctive relief in the Commonwealth Court's original jurisdiction.[6] The petitions named as respondents the Commonwealth of Pennsylvania, the Insurance Department, the Treasury De-

---

4. Act of Apr. 9, 1929, P.L. 343, No. 176.

5. Pennsylvania is required to have a balanced budget. *See* PA. CONST. art. VIII, §§ 12, 13; *Jubelirer v. Rendell*, 598 Pa. 16, 41–42, 953 A.2d 514, 529 (2008).

6. Two petitions were filed, one by the Pennsylvania Medical Society ("PAMS") on behalf of itself and its members, and the other by Hospital & Healthsystem Association of Pennsylvania ("HAP") on behalf of itself and its members, Geisinger Health System, St. Vincent Health Center and Abington Memorial Hospital. The petitions were consolidated on November 9, 2009.

partment, and the Office of the Budget (collectively, the "Commonwealth"),[7] and sought a declaration that: (1) the transfer of $100 million from the MCARE Fund to the General Fund extinguished vested rights or constituted an illegal taking in violation of the due process guarantees contained in Article I, Section 1 of the Pennsylvania Constitution and the Fourteenth Amendment to the U.S. Constitution (Count I); and (2) the transfer violated the Uniformity Clause of the Pennsylvania Constitution (Count II). The petitions also requested injunctive relief to prevent the transfer of funds or remediate any unlawful action taken pursuant to Act 50.

Concerned that the Commonwealth might effectuate the transfer and dissipate the funds, Appellees filed an application for preliminary injunctive relief in the nature of a temporary restraining order. They alleged that the only way to preserve the status quo pending the outcome of the litigation would be to retain the monies in the MCARE Fund, since there was no guarantee that the Commonwealth could reconstitute the funds from any other source. The Commonwealth responded that a preliminary injunction was unwarranted because, *inter alia*, it was not needed to prevent immediate and irreparable harm. *See generally Warehime v. Warehime*, 580 Pa. 201, 209–10, 860 A.2d 41, 46–47 (2004) (reciting the six prerequisites that a party must establish to obtain preliminary injunctive relief, including a showing that such relief is necessary to prevent immediate and irreparable harm). The Commonwealth suggested, in this regard, that it could "make [Appellees] whole" by depositing $100 million back into the MCARE Fund in the event of an adverse judgment. Commonwealth's Memorandum in Opposition to Petitioners' Application for Special Relief in the Nature of a Temporary Restraining Order at 15, *reproduced* in R.R. 202a. By order dated October 19, 2009, the Commonwealth Court expressed agreement with the Commonwealth's position in this regard, and denied the requested relief. The court noted, in particular, that Appellees based their irreparable-harm assertion on an as-

7. The Treasury Department was later dismissed from the actions on the basis of a stipulation entered by the parties.

sumption that the Commonwealth would not honor a final judicial order, which amounted to "pure speculation." *HAP v. Commonwealth*, 522 & 523 M.D. 2009, *Order* at 6 (Pa.Cmwlth. Oct. 19, 2009), *reproduced* in R.R. 216a. Thereafter, the Treasury Department effectuated the $100 million transfer on October 30, 2009.

The petitions were eventually consolidated, whereupon Appellees filed an application for summary relief. *See* Pa.R.A.P. 1532(b). On April 15, 2010, the Commonwealth Court granted Appellees' request in a published opinion, holding that the transfer of monies from the MCARE Fund to the General Fund was unlawful in that it impaired Appellees' vested rights. *See Hosp. & Healthsystem Ass'n of Pa. v. Commonwealth*, 997 A.2d 392, 401 (Pa.Cmwlth.2010) (en banc) ("*HAP I*").[8]

First, the court disagreed with the Commonwealth's assertion that Appellees were not entitled to summary relief because there were material facts in dispute and discovery remained outstanding, reasoning that the issue before the court regarding the lawfulness of the $100 million transfer was a question of law that needed no additional factual development. *See id.* at 396–97 & n. 9. Next, the court rejected the Commonwealth's contention that Appellees did not have standing to bring their respective actions. Finding that the trans-

8. Because the accompanying order granted the application for summary relief without further elaboration, *see id.* at 403, it implicitly subsumed a directive to the Commonwealth to return $100 million to the MCARE Fund. *See* Application for Summary Relief, at 9, ¶ 44, *reproduced* in R.R. 226a (reflecting that the prayer for relief includes a request for such a directive).

Separately, on the same day the Commonwealth Court also granted summary relief to PAMS and several physicians in a distinct matter, in which the petitioners challenged a portion of Act 50 that repealed the MCARE Act's Health Care Provider Retention Program and directed the transfer of $708 million from the Health Care Provider Retention Account ("HCPRA") to the General Fund. *See Pa. Med. Soc'y v. Dep't of Pub. Welfare*, 994 A.2d 33 (Pa.Cmwlth.2010) (*en banc*) ("*PAMS I*"). This Court reversed, concluding that any prospective transfers from the HCPRA to the MCARE Fund were discretionary, and hence, Appellees had no vested entitlement to the funds in question. *See Pa. Med. Soc'y v. Dep't of Pub. Welfare*, 614 Pa. 574, 603–04, 39 A.3d 267, 285–86 (2012) ("*PAMS II*").

fer of $100 million from the MCARE Fund diverted those monies from their intended purpose of providing insurance coverage to participating health care providers and prevented them from ultimately being refunded to those providers upon the MCARE Fund's termination, the court concluded that Appellees were aggrieved and had standing to bring the present legal challenge. *See id.* at 397–98.

With respect to Appellees' argument that they have vested rights in the monies in the MCARE Fund, the majority acknowledged that the General Assembly is free to repeal and amend legislation, but observed that Section 1976 of the Statutory Construction Act, as well as the Remedies Clause of the Pennsylvania Constitution, protect vested rights and accrued causes of action from impairment by subsequent legislation. *See* PA. CONST. art. I, § 11 ("[E]very man for an injury done him ... shall have remedy by due course of law[.]"); 1 Pa.C.S. § 1976(a) ("The repeal of any civil provisions of a statute shall not affect or impair any ... right existing or accrued ...."). The court indicated, first, that "the depletion of the MCARE Fund leaves participating providers with a deficit they must make up in the event that claims must be paid thereafter." *HAP I,* 997 A.2d at 400. It then noted that Sections 712(a) and 712(k) of the MCARE Act guarantee that the monies in the MCARE Fund will be used for MCARE-related purposes or returned to contributing health care providers upon the fund's termination. Particularly in light of this latter observation, the Commonwealth Court ultimately held that Appellees have a vested entitlement—rising above the level of a "mere expectation"—to have the monies used for those purposes, and that such a right "cannot be extinguished by the addition of Section 1717.1–K of the Fiscal Code." *Id.* at 401.

As to Appellees' alternative argument, the court concluded that the transfer did not implicate uniformity concerns. *See* PA. CONST. art. VIII, § 1 ("All taxes shall be uniform, upon the same class of subjects, within the territorial limits of the authority levying the tax, and shall be levied and collected under general laws."). The court reasoned that, because the assessments paid into the MCARE Fund are intended to

reduce the high costs of medical liability insurance, are placed in a special fund within the state treasury, and do not raise revenue or generate interest income for the Commonwealth, the assessments are akin to license fees, rather than taxes that must conform to uniformity requirements. *See HAP I*, 997 A.2d at 402.

Judge (now President Judge) Pellegrini dissented, incorporating the dissent he filed in *PAMS I*. In that matter, he had concluded that: Appellees did not have vested rights to the monies at issue; there were disputed facts in need of resolution that precluded the grant of summary relief; the members of PAMS and HAP lacked standing; the Commonwealth was unable to comply with the majority's order and transfer funds from the General Fund to any other account without first obtaining express authorization from the General Assembly; the General Assembly was an indispensable party, and as such, its absence deprived the court of jurisdiction; and the entire matter was nonjusticiable under the political question doctrine. *See id.* at 403 (Pellegrini, J., dissenting) (citing *PAMS I*, 994 A.2d at 46–53 (Pellegrini, J., dissenting)).

The Commonwealth appealed to this Court, raising threshold issues pertaining to justiciability and standing, arguing that Appellees had no vested interest in the money that was transferred to the General Fund, and contending that summary relief was premature because contested factual issues remained, requiring further discovery.

## II. Justiciability

### A. Political Question

One threshold question forwarded by the Commonwealth pertains to whether this case is non justiciable under the political-question doctrine, a principle that derives from the separation of powers among the three coordinate branches of government. *See Pa. Sch. Bds. Ass'n v. Commonwealth Ass'n of Sch. Adm'rs,* 569 Pa. 436, 451, 805 A.2d 476, 484–85 (2002). The Commonwealth notes that, in *Baker v. Carr,* 369 U.S. 186, 211, 82 S.Ct. 691, 706, 7 L.Ed.2d 663 (1962), the Supreme Court determined that the judiciary should not reach the merits of a dispute, *inter alia,* where the actions being chal-

lenged are constitutionally committed to another branch of government. The Commonwealth maintains that Appellees are asking this Court to dictate how the General Assembly should budget and appropriate funds, and that such functions are constitutionally committed to the executive and legislative branches.[9]

Appellees respond that, although this case may have financial implications for the Commonwealth, that is true of many judicial decisions involving the Commonwealth. They reason that courts should not shrink from their duty to protect citizens' constitutional rights, whether or not the dispute arises in a political context. Appellees also proffer that the Commonwealth waived this issue by failing to raise it before the Commonwealth Court.

■ "Ordinarily, the exercise of the judiciary's power to review the constitutionality of legislative action does not offend the principle of separation of powers." *Sweeney v. Tucker*, 473 Pa. 493, 508, 375 A.2d 698, 705 (1977) (citing *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803)); *see also Powell v. McCormack*, 395 U.S. 486, 549, 89 S.Ct. 1944, 1978, 23 L.Ed.2d 491 (1969) ("Our system of government requires that . . . courts on occasion interpret the Constitution in a manner at variance with the construction

---

9. The Commonwealth also suggests that it lacks the power to transfer money back into the MCARE Fund and, as such, it cannot comply with any remedy requiring such a monetary transfer. *See* Brief for Commonwealth, at 49. As Appellees correctly note, however, *see* Brief for Appellees at 50–51, the Commonwealth is judicially estopped from making this argument because, as explained, it prevailed on an opposite contention when opposing Appellees' request for a preliminary injunction. *See generally New Hampshire v. Maine*, 532 U.S. 742, 749, 121 S.Ct. 1808, 1814, 149 L.Ed.2d 968 (2001) (stating that judicial estoppel "prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." (quoting *Pegram v. Herdrich*, 530 U.S. 211, 227 n. 8, 120 S.Ct. 2143, 2153 n. 8, 147 L.Ed.2d 164 (2000))); *In re Estate of Bullotta*, 575 Pa. 587, 591, 838 A.2d 594, 596 (2003) (observing that litigants may not "play[ ] fast and loose" with the courts by "switching positions as required by the moment" (internal quotation marks and citations omitted)). Moreover, this Court may determine the requirements of the law whether or not our role extends to directing how compliance with the law will be effectuated. *See Thornburgh v. Lewis*, 504 Pa. 206, 212, 470 A.2d 952, 955 (1983).

given the document by another branch. The alleged conflict that such an adjudication may cause cannot justify the courts' avoiding their constitutional responsibility."). Still, judicial abstention under the political-question precept may be implicated in certain limited settings, such as where it is demonstrable from the constitution's text that the matter in question is committed to the political branches, or where there is an "unusual need for unquestioning adherence to a political decision already made." *Baker*, 369 U.S. at 217, 82 S.Ct. at 710.[10]

In *Sweeney*, this Court highlighted a difference between controversies where the judiciary determines whether another branch did or did not act within the power conferred on it by the Constitution, and matters involving non justiciable political questions. Drawing on scholarship, *Sweeney* indicated that cases falling into the latter category occur where the determination of whether the government acted appropriately has itself been "entrusted exclusively and finally to the political branches of government for self-monitoring." *Sweeney*, 473 Pa. at 509, 375 A.2d at 706 (quoting Louis Henkin, *Is there a "Political Question" Doctrine?*, 85 YALE L.J. 597, 599 (1976)).

To illustrate, *Sweeney* referenced *Powell*, which involved whether the House of Representatives could refuse to seat a duly-elected member. The challenge was deemed justiciable because the Constitution sets forth express qualifications for membership, and Congress is not at liberty to add new qualifications. *See Powell*, 395 U.S. at 547–48, 89 S.Ct. at 1977–78. Quoting from Justice Douglas's concurrence, the

10. The often-quoted passage from *Baker* states:

Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Id.*

*Sweeney* Court continued that a challenge to the expulsion of an already-seated member for misconduct, *see* U.S. CONST. art. I, § 5 (permitting Congress to "punish its Members for disorderly Behaviour" and to expel a member by two-thirds vote), might be non justiciable, since the grounds for punishment or expulsion of a member are committed by the Constitution to the House's internal rules. *See Sweeney,* 473 Pa. at 512, 375 A.2d at 707. Consistent with *Sweeney,* a plurality of this Court in *Blackwell v. City of Philadelphia,* 546 Pa. 358, 684 A.2d 1068 (1996), developed that, although there is no definitive "semantic cataloguing" of cases in which a non-justiciable political question is raised, as a general proposition courts "refuse to scrutinize a legislature's choice of, or compliance with, internal rules and procedures," so long as the legislative body or its members "did not violate any constitutional or statutory provision." *Id.* at 365, 684 A.2d at 1071.[11]

Finally, the need for courts to fulfill their role of enforcing constitutional limitations is particularly acute where the interests or entitlements of individual citizens are at stake. *See Sweeney,* 473 Pa. at 517, 375 A.2d at 709 ("[T]he political question doctrine is disfavored when a claim is made that individual liberties have been infringed."). Drawing upon this

11. *Compare, e.g., Mapp v. Lawaetz,* 882 F.2d 49, 54 (3d Cir.1989) (refusing to reach the merits of a complaint alleging that the Virgin Islands legislature failed to adhere to an internal rule requiring a two-thirds majority vote to remove a member for misconduct), *and Blackwell,* 546 Pa. at 368, 684 A.2d at 1073 (finding a dispute non-justiciable where the plaintiff asserted that the city council violated its own rules in discharging a council member's special assistant) (plurality in relevant part), *with Zemprelli v. Daniels,* 496 Pa. 247, 258, 436 A.2d 1165, 1170 (1981) (holding that a justiciable question was presented where the issue was whether an internal rule of the state Senate concerning the confirmation of gubernatorial appointments was consistent with the state Constitution's requirements for confirmation), *Sweeney,* 473 Pa. at 522, 375 A.2d at 712 (finding that the political question doctrine did not preclude judicial review of a claim that the expulsion of a member of the Pennsylvania House of Representatives from his seat violated his federal constitutional rights), and *Pa. Sch. Bds. Ass'n,* 569 Pa. at 451–52, 805 A.2d at 485 (determining that the political question doctrine did not prevent the Court from deciding the validity of legislation which was challenged based on Article III, Section 4 of the Pennsylvania Constitution, which requires every bill to be considered on three separate days in each House).

Court's decision in *Consumer Party of Pennsylvania v. Commonwealth*, 510 Pa. 158, 507 A.2d 323 (1986), *overruled* on other *grounds by Pennsylvanians Against Gambling Expansion Fund, Inc. v. Commonwealth*, 583 Pa. 275, 316–17, 877 A.2d 383, 408 (2005), the Commonwealth Court has explained that:

> A determination that an issue is a nonjusticiable political question is essentially a matter of judicial abstention or restraint. As our Supreme Court has said: "To preserve the delicate balance critical to a proper functioning of a tripartite system of government, this Court has exercised restraint to avoid an intrusion upon the prerogatives of a sister branch of government. . . ."

> Here, Petitioners allege various constitutional violations. In such cases, we will not abdicate our responsibility to "insure that government functions within the bounds of constitutional prescription . . . under the guise of deference to a coequal branch of government. . . . [I]t would be a serious dereliction on our part to deliberately ignore a clear constitutional violation."

*Jubelirer v. Singel*, 162 Pa.Cmwlth. 55, 66–67, 638 A.2d 352, 358 (1994) (quoting *Consumer Party*, 510 Pa. at 176–78, 507 A.2d at 332–333).

▮▮▮▮ As in *Jubelirer*, Appellees here allege constitutional violations, namely, that Act 50 violates their constitutionally-guaranteed rights to due process and uniformity of taxation. This is significant because, regardless of the extent to which the political branches are responsible for budgetary matters, they are not permitted to enact budget-related legislation that violates the constitutional rights of Pennsylvania citizens. Applying the guidelines set forth in *Baker*, moreover, we find that determining whether Act 50's transfer of $100 million from the MCARE Fund to the General Fund violated the Constitution is not a matter that has been textually committed to a coordinate branch of government, nor is there an unusual need for unquestioning adherence to the legislative decision already made, particularly as the Commonwealth has represented that it can comply with an order granting relief. Furthermore, this case does not present any of the other

characteristics of a non justiciable political question mentioned in *Baker.* For example, there is no "potentiality of embarrassment from multifarious pronouncements by various departments on one question." *See supra* note 10. Notably, in this respect, the political question doctrine does not exist to remove a question of law from the Judiciary's purview merely because another branch has stated its own opinion of the salient legal issue. *See Council 13, AFSCME, AFL–CIO ex rel. Fillman v. Rendell,* 604 Pa. 352, 373, 986 A.2d 63, 76 (2009).[12] Hence, we conclude Appellees have not asserted a non justiciable political question.[13]

## B. Standing

■ The Commonwealth also contends that Appellees lack standing to challenge the $100 million transfer. Primarily, it

12. The Commonwealth states briefly that there are no judicially manageable standards to apply, and that the constitutionality of the challenged legislation can only be decided with an initial, legislative policy determination. "Simply put," the Commonwealth continues, "where is the money to come from and what other programs should be defunded?" Brief for Commonwealth at 48. Such questions need not be answered in order to resolve whether the initial transfer of the money violated Appellees' constitutional rights. As will be seen, moreover, there are judicially manageable standards for making that assessment.

The Commonwealth also asserts that any ruling in favor of Appellees would express a "lack of the respect due coordinate branches of the government." *Id.* (quoting, indirectly, *Baker,* 369 U.S. at 217, 82 S.Ct. at 710). The Commonwealth appears to interpret the "respect" criterion more broadly than *Baker* intended. *See, e.g., United States v. Munoz–Flores,* 495 U.S. 385, 390, 110 S.Ct. 1964, 1968, 109 L.Ed.2d 384 (1990) ("The Government may be right that a judicial finding that Congress has passed an unconstitutional law might in some sense be said to entail a 'lack of respect' for Congress' judgment. But disrespect, in the sense the Government uses the term, cannot be sufficient to create a political question. If it were, *every* judicial resolution of a constitutional challenge to a [statute] would be impermissible." (emphasis in original)).

13. In view of our holding, we need not presently decide whether a political-question argument may be waived—an issue on which this Court has not spoken. *See generally Commonwealth v. Hughes,* 581 Pa. 274, 304 & n. 12, 865 A.2d 761, 778–79 & n. 12 (2004) (for prudential reasons, declining to resolve whether a competency claim may be waived where the claim lacked merit). We believe it prudent to leave that question for a case where its resolution is material to the outcome,

alleges that Appellees lack a direct and immediate interest in the resolution of the legal question presented. Its argument has two parts. First, it argues that any prospective distribution of the remaining balance in the MCARE Fund to health care providers upon the fund's termination is remote and speculative. Second, it asserts that the statutory formula for the computation of yearly assessments does not depend, directly or indirectly, on the fund's balance at the end of the preceding year. Hence, the argument goes, Appellees' future assessments would not be reduced even if their legal argument prevails and $100 million is transferred back into the MCARE Fund. *See* Brief for Commonwealth at 44–46.

 "The requirement of standing under Pennsylvania law is prudential in nature, and stems from the principle that judicial intervention is appropriate only where the underlying controversy is real and concrete, rather than abstract." *City of Phila. v. Commonwealth*, 575 Pa. 542, 559, 838 A.2d 566, 577 (2003). "A party has standing to bring a cause of action if it is 'aggrieved' by the actions complained of, that is, if its interest in the outcome of the litigation is substantial, direct, and immediate." *City of Phila. v. Schweiker*, 579 Pa. 591, 604, 858 A.2d 75, 83 (2004). A "substantial" interest is one that surpasses the common interest of all citizens in procuring obedience to the law. *See Bergdoll v. Kane*, 557 Pa. 72, 84, 731 A.2d 1261, 1268 (1999) (quoting *S. Whitehall Twp. Police Serv. v. S. Whitehall Twp.*, 521 Pa. 82, 86–87, 555 A.2d 793, 795 (1989)). A "direct" interest requires a showing that the matter complained of caused harm to the party. *See id.* An "immediate" interest involves the nature of the causal connection, *see id.*, and signifies that judicial intervention is ordinarily inappropriate when the harm alleged is remote and speculative. *See City of Phila.*, 575 Pa. at 561, 838 A.2d at 578.

Appellees averred in their petitions that the $100 million transfer diverted monies that they paid into the MCARE

particularly given the lack of focused advocacy on the issue from both sides of the present dispute.

Fund under compulsion of law and, as such, (a) violated their right, protected by the Due Process Clause, to have the funds used to satisfy judgments against them pursuant to the MCARE Act, and (b) constituted an impermissible, non-uniform tax upon health care providers. They also claimed that the re-infusion of $100 million back into the MCARE Fund would reduce their assessments under the statutory formula (an issue on which litigation is pending, as discussed below), and would additionally act as a buffer to protect them against spikes in assessments due to unfunded liabilities.

We conclude that Appellees' claims satisfy all three prongs of the standing test as enumerated above. Prior to the enactment of Act 50, the money in the MCARE Fund was legally dedicated for MCARE purposes only, *i.e.*, to satisfy judgments against Appellees. Appellees' interest in having that money used for such purposes clearly surpasses the common interest of all citizens in seeing that laws are obeyed. Also, the transfer of funds is the direct and immediate cause of the alleged infringement of Appellees' vested entitlements, as well as the alleged non-uniform taxation. In view of these circumstances, we conclude that the providers are aggrieved parties entitled to pursue both of their causes of action.[14] That being the case, moreover, we need not determine whether Act 50's effect on the distribution of monies upon termination of the MCARE Fund, potentially many years in the future, is too remote or speculative to confer standing.

## III. Merits

### A. Vested Interests

We now turn to the merits of Appellees' claim that, at the time Act 50 was passed, they had a constitutionally-protected

---

14. It also appears that the Hospital & Healthsystem Association of Pennsylvania and the Pennsylvania Medical Society each has associational standing as a representative of its members. *See Warth v. Seldin,* 422 U.S. 490, 511, 95 S.Ct. 2197, 2211, 45 L.Ed.2d 343 (1975). Regardless, the fact that the individual providers have standing is alone sufficient for this Court to reach the merits. *See City of Phila.,* 575 Pa. at 563 n. 8, 838 A.2d at 579 n. 8 (2003) (where a city and its mayor sought relief, the Court did not need to consider whether the mayor had standing after it determined that the city had standing).

vested interest in having existing MCARE monies used for MCARE purposes, such that the interest could not be infringed by the legislation under review. Appellees' present advocacy intermixes concepts of vested rights under the Due Process Clause and causes of action under the Remedies Clause. *See* Brief for Appellees at 29–41. Although they place much of their emphasis on the Remedies Clause, *see* PA. CONST. art. I, § 11 ("All courts shall be open; and every man for an injury done him in his lands, goods, person or reputation shall have remedy by due course of law[.]"), we consider the due process aspect of Appellees' argument sufficiently developed to preserve that claim as such. *See, e.g.,* Brief for Appellees at 29–30 (arguing that due process prohibits interference with vested rights, and quoting cases reflecting this prohibition).[15] Moreover, we have often considered the Remedies Clause as being directed to protecting causes of action (and defenses) from impairment after they have accrued.[16] Because Appellees do not contend that Act 50 undermined a cause of action that accrued in their favor during the pre-enactment timeframe, but instead forward averments concerning their alleged interests vis-à-vis the use of certain funds, we believe it would be most straightforward to treat their vested-rights claim as

15. The state and federal due process provisions, *see* PA. CONST. art. I, §§ 1, 9; U.S. CONST. amend. XIV, are "substantially equivalent" in their protective scope. *Krenzelak v. Krenzelak,* 503 Pa. 373, 382, 469 A.2d 987, 991 (1983). Appellees each raised due process claims in the first count of their respective Petitions for Review, *see* Petition for Review of Hosp. & Healthsystem Ass'n of Pa., *et al.,* at 8–10, *reproduced* in R.R. 26a28a; Petition for Review of Pa. Med. Soc'y, at 7–9, *reproduced* in R.R. 53a–55a, and have, throughout the litigation, pursued due process arguments based on an asserted impairment of vested rights. *See* Petitioners' Brief in Support of Application for Summary Relief, at 13–23, *reproduced* in R.R. 413a–423a; Petitioners' Reply Brief in Support of Application for Summary Relief, at 9–17, *reproduced* in R.R. 935a–943a.

16. *See, e.g., Ieropoli v. AC & S Corp.,* 577 Pa. 138, 149–51, 842 A.2d 919, 926–27 (2004) (quoting *Menges v. Dentler,* 33 Pa. 495, 498–99 (1859), and *Lewis v. Pa. R.R. Co.,* 220 Pa. 317, 323–24, 69 A. 821, 823 (1908)); *Gibson v. Commonwealth,* 490 Pa. 156, 160–61, 415 A.2d 80, 83 (1980); *see also Konidaris v. Portnoff Law Assocs.,* 598 Pa. 55, 75, 953 A.2d 1231, 1242 (2008) (referencing "our Court's extension of the Remedies Clause to defenses").

primarily implicating protections under the Due Process Clause.

The Commonwealth argues that Appellees did not have a vested right in the MCARE monies because the MCARE fund is not a trust fund. Although its predecessor, the Medical Professional Liability Catastrophe Loss Fund (the "CAT Fund"), *see* 40 P.S. § 1303.701(d) (superseded); *see generally Heim v. MCARE Fund,* 611 Pa. 1, 3–4, 23 A.3d 506, 507–08 (2011), was established as a trust fund, the MCARE Fund, observes the Commonwealth, is denoted as a "special" fund within the State Treasury. The Commonwealth proffers, in this regard, that the Governor's Office Manual of Accounting defines a trust fund as a fund containing assets held in trust for someone else, whereas it states that a special fund is subject to budgetary control and, as such, may be redirected to other uses based on legislative changes.

The Commonwealth additionally maintains that nothing in the MCARE Act created vested rights as to the use of MCARE monies. It acknowledges that Section 712(a) of the MCARE Act states that Fund monies "shall be used to pay claims against" health care professionals. The Commonwealth reasons, however, that statutory pledges are unenforceable as against subsequent General Assemblies, and that, in any event, the money has never been promised to providers themselves, but to the victims of their alleged malpractice. As well, the Commonwealth develops that, in the pre-budget-crisis timeframe, the fund received well over $100 million derived from cigarette taxes and motor vehicle violation surcharges, which was used to fund abatements to provider assessments under the state's Health Care Provider Retention Program (addressed more fully in *PAMS II* ). Thus, in the Commonwealth's view, it was entitled to reallocate at least $100 million on that basis alone. The Commonwealth contends further that the MCARE Fund has always met its statutory obligations, and there is no reason to believe that any future claim will remain unpaid as a result of the transfer of $100 million. Overall, the Commonwealth argues that, to hold that the already-paid-in money could not be diverted to

another governmental use would restrain legislative bodies from reacting to changing priorities and circumstances.

Alternatively, the Commonwealth asserts that, even assuming Appellees had a vested interest in the money transferred out of the MCARE Fund, Act 50 did not impair that interest, for two reasons. First, the Commonwealth avers that the funding formula for calculating assessments is independent of the balance in the fund and, as such, it is independent of the amount diverted from the fund. Second, the Commonwealth maintains that, because the MCARE Fund has covered all claims for which it has been liable, Appellees have received the benefits to which they were entitled under the MCARE Act. Rather than suffering an impairment of a vested right, according to the Commonwealth, Appellees have received—and will continue to receive—fair exchange for their assessments.[17]

Appellees respond that their interest in the transferred money was indeed vested because Section 712 establishes a *quid pro quo* whereby health care providers are required to pay assessments to be licensed to practice in Pennsylvania, while the money in the fund is to be used to satisfy judgments against them. In this respect, Appellees note that the language of Section 712(a) is mandatory, providing that MCARE money "shall," rather than "may," be used to pay claims against health care providers. *See* 40 P.S. § 1303.712(a). Appellees proffer that the mandatory nature of the directive remains in force regardless of whether some monies have been included in the fund from non-provider sources such as cigarette taxes or vehicle violations, and regardless of whether the Governor's manual classifies the fund as a trust fund or a special fund.

Further, Appellees suggest that Act 50 impaired their vested rights because every dollar taken from the MCARE Fund is necessarily a dollar that providers will have to pay into the

17. The Commonwealth also argues that the provision for distribution of proceeds under Section 712(k) decades in the future did not create any vested right harmed by the 2009 legislation. We will discuss this aspect of the MCARE Act below, in addressing whether the transferred funds amounted to surplus monies within the MCARE Fund.

fund in the future to cover claims. Thus, because the MCARE Fund pays liabilities by levying annual assessments according to the statutory funding formula, and future liabilities are unfunded, Appellees reason that they will be subject to higher annual assessments to pay for present and future claims as a result of Act 50. In this respect, they also argue that, in the event the MCARE Fund has insufficient funds to pay claims and expenses, it will have to borrow money, a cost providers will have to bear via the following year's assessments. Accordingly, Appellees state that it is immaterial whether they have received all to which they are entitled, as the Commonwealth highlights. Rather, Appellees aver that, regardless of the MCARE Fund's history of claims payments leading up to Act 50, providers remain obligated to pay assessments sufficient to cover claims that will become payable in the future, and that the subtraction of a substantial amount of money from the fund to balance the 2009–10 budget cannot help but increase their future payments.

▬▬▬▬ "An application for summary relief may be granted if a party's right to judgment is clear and no material issues of fact are in dispute." *Jubelirer v. Rendell*, 598 Pa. 16, 28, 953 A.2d 514, 521 (2008) (internal quotation marks and citation omitted); *see* Pa.R.A.P. 1532(b). In ruling on a request for summary relief, the Commonwealth Court views the evidence in the light most favorable to the non-moving party, and enters judgment only if there is no genuine issue as to any material fact and the right to relief is clear as a matter of law. *See Chester Cmty. Charter Sch. v. Dep't of Educ.*, 44 A.3d 715, 720 n. 6 (Pa.Cmwlth.2012).[18] In reviewing the Commonwealth Court's decision to grant summary relief, this Court also considers the record favorably to the non-moving party and resolves all doubts as to the existence of a genuine issue of material fact against the moving party. *See PAMS II*, 614 Pa. at 589, 39 A.3d at 277. A fact is considered material if its

18. The summary relief standard under this rule is similar to the summary judgment standard under the Pennsylvania Rules of Civil Procedure. *See PAMS II*, 614 Pa. at 589 n. 11, 39 A.3d at 276 n. 11; *Brittain v. Beard*, 601 Pa. 409, 417, 974 A.2d 479, 484 (2009); Pa.R.A.P. 1532, Official Note.

resolution could affect the outcome of the case under the governing law. *See Strine v. MCARE Fund,* 586 Pa. 395, 402, 894 A.2d 733, 738 (2006) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)).

 Applying these principles to the present case, it is important to note, preliminarily, that the challenged provision of the Fiscal Code is not directed to any funding to be obtained after the date of its enactment. Rather, it mandates that $100 million that had already been paid into the MCARE Fund be transferred to the General Fund. *See* 72 P.S. § 1717.1–K(1). At the time those monies were paid in, the governing statute provided that they "shall be used to pay claims against participating health care providers." 40 P.S. § 1303.712(a). Such use was thus a legal consequence of their payment at the time they were supplied. The change in use dictated by Section 1717.1–K(1) alters that consequence and, as such, is retrospective in nature. *See generally Landgraf v. USI Film Prods.,* 511 U.S. 244, 270, 114 S.Ct. 1483, 1499, 128 L.Ed.2d 229 (1994) (indicating that a statute is "retrospective" or "retroactive" if it "attaches new legal consequences to events completed before its enactment"); *see also id.* at 269 n. 23, 114 S.Ct. at 1499 n.23 (citing authorities). The retrospective character of Section 1717.1–K(1), in turn, implicates this Court's recognition that due process norms limit the government's ability to extinguish vested rights (or entitlements) through retroactive legislation. *See, e.g., Krenzelak v. Krenzelak,* 503 Pa. 373, 388, 469 A.2d 987, 994 (1983); *Bellomini v. State Employees' Ret. Bd.,* 498 Pa. 204, 212, 445 A.2d 737, 741 (1982) (plurality). The question becomes, then, whether the health care providers had a vested entitlement to have the pre-enactment assessment monies used for MCARE purposes.

 The MCARE Act is unusual in that it amounts to something very similar to a government-run supplemental insurance program. It was enacted to abate a malpractice insurance exigency serious enough to require legislative intervention. As such, MCARE comprises social legislation specifi-

cally designed (among other things) to ensure that Pennsylvania citizens have access to the care they need by incentivizing health care professionals to stay in Pennsylvania, or move to Pennsylvania, and fulfill those needs. *See, e.g.,* 40 P.S. §§ 1303.102 ("It is the purpose of th[e MCARE] act to ensure that medical care is available in this Commonwealth through a comprehensive and high-quality health care system."); 1303.502 ("Ensuring the future availability of and access to quality health care is a fundamental responsibility that the General Assembly must fulfill as a promise to our children, our parents and our grandparents."); 1303.514. To this end, MCARE conditions a medical provider's ability to practice in Pennsylvania on participation in the MCARE Fund, which entails the payment of substantial monetary assessments within a statutory scheme that mandates that all such assessments be used to satisfy claims against the providers. *See* 40 P.S. § 1303.712(a). This latter condition is the linchpin to having the system work as intended. The assessment program was never intended as a general mechanism to raise tax revenue and, furthermore, there is a rational relationship between the monies paid in and their mandated use under Section 712(a) so as to prevent the condition-of-doing-business aspect of MCARE from having extortive overtones.

Within that context, the 2009 budget law redirected the MCARE Fund's monies to close a general budgetary gap—a measure having nothing to do with the MCARE statute or its purposes. We mention this not as a criticism of the Legislature's judgment, since this Court is not tasked with evaluating the wisdom of that body's policy choices. Rather, the point is that the Legislature encouraged providers to rely on a scheme that it designed, participation in which was mandatory, and under which assessments extracted from medical providers were required to be used in a manner rationally related to the carrying on of their practices. Accordingly, the providers were led to believe that they could depend upon the program as established in making major practice-related decisions.

This state of affairs elevated MCARE Fund monies above the status of standard budgeting allocations that all affected parties understand may be altered at will by the Legislature. Instead, the Legislature effectively said to the providers, "you *must* supply these funds, and they will be used to satisfy judgments against you." [19] That being the case, we conclude that the MCARE Fund, although labeled a "special fund," is in the nature of a trust fund whose monies are held for the purpose designated by statute. *See Daugherty v. Riley*, 1 Cal.2d 298, 34 P.2d 1005, 1010 (1934) (reaching a similar conclusion with regard to a "special fund" set aside for exclusive use by a state commission on corporations). Since that purpose involved satisfying judgments against the health care providers, such providers retained a vested entitlement under the Due Process Clause to have the money utilized in the manner directed by statute. *See generally Konidaris v. Portnoff Law Assocs.*, 598 Pa. 55, 74, 953 A.2d 1231, 1242 (2008) (explaining that a "vested" right is one that rises above the level of a "mere expectation" that existing law will continue in place).[20] Contrary to the Commonwealth's argument,

19. Although, as the Commonwealth points out, some of the monies in the MCARE Fund may have originated from sources other than assessments, the fact remains that all such monies were commingled and, upon entering the MCARE Fund, were dedicated to the fund's purposes. The Pennsylvania Senate, as amicus, adds that the General Assembly must retain the authority to "re-appropriate [funds] as the public's needs change from year-to-year," and emphasizes that the 2009 budget crisis was severe. Senate's Amicus Brief at 15–16. To clarify, we are not suggesting that Section 712(a) binds subsequent legislatures on how MCARE monies may be used going forward. The question is whether the General Assembly was free to redirect assessment monies already paid into the MCARE Fund at the time the 2009 budget legislation was enacted. If the Constitution precluded it from doing so, the severity of the fiscal crisis is immaterial, as the Senate acknowledges. *See id.* at 15.

20. *Accord Bible v. Dep't of Labor & Indus.*, 548 Pa. 247, 261, 696 A.2d 1149, 1156 (1997) (quoting *Lewis v. Pa. R.R. Co.*, 220 Pa. 317, 324, 69 A. 821, 823 (1908)); *see also Landgraf*, 511 U.S. at 265–66, 114 S.Ct. at 1497 (warning that "settled expectations should not be lightly disrupted," and highlighting the importance of scrutinizing retrospective laws with particular caution because of the Legislature's "unmatched powers ... to sweep away settled expectations suddenly and without individualized consideration").

moreover, it is inconsequential that MCARE monies are never paid directly to providers, since they are paid to malpractice plaintiffs as a means of satisfying judgments against providers. *Accord Wis. Med. Soc'y v. Morgan,* 328 Wis.2d 469, 787 N.W.2d 22, 45 (2010) ("Under this arrangement, the Fund's payment of excess judgments benefits the health care providers because the payments are, in essence, made on the health care providers' behalf. They have a property interest in the payment of these excess judgments."); *cf. Alliance of Am. Insurers v. Chu,* 77 N.Y.2d 573, 569 N.Y.S.2d 364, 571 N.E.2d 672, 678 (1991) (invalidating a law redirecting to the state's general fund monies earned by an insurance security fund before the law's enactment, where such monies had, in the pre-enactment timeframe, been statutorily mandated to be returned to the contributors or credited toward their future assessments).

On the other hand, courts have recognized that legislative bodies retain authority to control the fate of special funds in order to serve the changing needs of the government. *See Washington, D.C. Ass'n of Realtors, Inc. v. District of Columbia,* 44 A.3d 299, 305 & n. 28 (D.C.2012) (collecting cases for the "principle that a state legislature may, by statute, divert special funds set aside for particular purposes to a different purpose so long as doing so would not contravene a specific constitutional provision controlling the fund or breach a contractual obligation"). While that precept's application may be limited in connection to monies held in trust or otherwise protected by vested entitlements as to the manner of their use, such authority ordinarily remains with regard to any surplus monies that continue in the fund after the accomplishment of its purposes. *See* 81A C.J.S. *States* § 387 (2012) (indicating that a surplus in a trust fund may be diverted notwithstanding that legislatures may not ordinarily authorize a diversion of special funds where such a diversion would be unconstitutional or amount to a breach of trust or contract); *Daugherty,* 34 P.2d at 1010 (suggesting that if and when the commission on corporations no longer needs the funds held in trust, the state legislature may use them for other public

purposes).[21] Whether the contested $100 million, or some part of it, represented a surplus in the MCARE Fund at the time Act 50 was passed is therefore a fact which is material to the outcome of Appellees' due-process/vested-rights claim.

Notably, the question was in dispute during the proceedings in the Commonwealth Court. As the Commonwealth correctly observes, the court's summary disposition rested, at least in part, on its assumptions that "the depletion of the MCARE Fund leaves participating providers with a deficit they must make up in the event that claims must be paid thereafter," *HAP I*, 997 A.2d at 400, and that "the future obligations of the MCARE Fund are in jeopardy due to the transfer of the $100 million," *id.* at 396 n. 9. *See* Brief for Commonwealth at 36, 52. The evidentiary record, however, is not entirely clear on this point and, moreover, includes a declaration by the Insurance Commissioner explaining that, due to the manner in which the fund makes payments and obtains funds, it will have enough money to fulfill all of its obligations in spite of the $100 million transfer. *See* Declaration of Peter J. Adams, *reproduced* in R.R. 656a–658a; *see also id.* at 2 ¶ 8 (alleging that the MCARE balance was $322 million before the $100 million was transferred).[22] When such evidence is viewed in the light most favorable to the Commonwealth as the non-moving party, it raises a genuine, material question of fact concerning a possible surplus, which in turn implicates the Legislature's authority with regard to the $100 million, as explained above.[23]

21. In dissent, Mr. Justice Baer relies on *Daugherty's* holding to the effect that monies in a trust fund cannot be supplanted if they are necessary to accomplish the fund's objectives. We have no disagreement with that proposition, and reference *Daugherty* only insofar as its dispositive and persuasive rationale does not preclude the transfer of monies when they are no longer needed or when such a diversion would not "interfere ... with the objects for which [the] fund was created." *Daugherty,* 34 P.2d at 1010.

22. The declaration was attached as an exhibit to the Commonwealth's Memorandum in Opposition to Petitioners' Application for Summary Relief.

23. As we have determined that the MCARE monies were effectively held in trust, the government bears the burden of demonstrating that the diverted funds were in the nature of a surplus. *See 500 James*

This factual circumstance also serves to highlight a more general legal issue that was never addressed by the Commonwealth Court, namely, how to determine whether a surplus exists within the framework of the MCARE Fund. At least two features of the fund appear relevant to such an inquiry. First, the annual assessment formula does not expressly take into account the size of the reserves already present. This militates in favor of the concept that the diverted monies were surplus funds, unless the formula implicitly accounts for extant reserves.[24] Second, although one could argue that the distribution of remaining funds upon termination of the MCARE Fund under Section 712(k) precludes any possibility of such reserves being characterized as surplus as of the time Act 50 was passed, *see, e.g.,* Dissenting Opinion, at 297–99, 77 A.3d at 610–11 (Baer, J.), we find it significant that the distribution, if it occurs at all, does not appear likely to take place for at least forty years. Given such a long time interval, the identities of the parties who would receive the money is uncertain, inasmuch as new providers may establish practices and existing providers may cease practicing or leave Pennsylvania during the intervening period.

In sum, then, we hold that the October 2009 amendment to the Fiscal Code transferring $100 million from the MCARE Fund to the General Fund implicated the providers' due process rights, but that the question of whether the legislation was finally unconstitutional requires further factual development. Accordingly, we will reverse the Commonwealth Court's order granting summary relief and remand for further proceedings.

*Hance Court v. Pa. Prevailing Wage Appeals Bd.,* 613 Pa. 238, 272–73, 33 A.3d 555, 575–76 (2011).

**24.** The Commonwealth Court recently held that the statutory formula accounts for extant reserves via direct implication of its express language. *See Hosp. & Healthsystem Ass'n of Pa. v. Ins. Comm'r,* 74 A.3d 1108, 2013 WL 4033850 (Pa.Cmwlth. Aug. 9, 2013) (*en banc* ) (petition for allowance of appeal pending at No. 681 MAL 2013). How this affects the determination as to the existence and size of a surplus is to be considered in the first instance by the Commonwealth Court on remand.

## B. Tax Uniformity

 Finally, Appellees seek to preserve the judgment in their favor by renewing an argument they made to the Commonwealth Court, namely, that the $100 million diversion to the General Fund amounts to a discriminatory tax in violation of the Uniformity Clause of the Pennsylvania Constitution. *See* PA. CONST. art. VIII, § 1 (requiring that taxes be (a) uniform on the same class of subjects, and (b) collected under general laws). Appellees submit that the Commonwealth Court improperly disposed of this issue by viewing it as a challenge to the initial collection of the assessments, which the court described as license fees, *see HAP I*, 997 A.2d at 402, rather than to the transfer of the assessment monies to the General Fund, which Appellees contend converted them into general-revenue taxes. Appellees argue that such a "tax" was non-uniform because there is no logical basis for singling out health care providers to contribute extra funds for the Commonwealth's general expenditures. *See* Brief for Appellees at 42 ("No reasonable difference exists between health care providers and all other taxpayers sufficient to justify this difference in tax treatment.").[25]

 In matters of taxation, this Court has historically analyzed the limitations imposed by the state Uniformity Clause and the federal Equal Protection Clause as being "largely coterminous." *Clifton v. Allegheny Cnty.*, 600 Pa. 662, 687 n. 21, 969 A.2d 1197, 1212 n. 21 (2009).[26] These clauses do not obligate the government to treat all persons identically, but they do assure that all similarly-situated per-

25. Appellees do not argue that the alleged tax is invalid on the basis that it was not levied under a general law. Also, the Commonwealth has not provided any advocacy on this issue.

26. In some contexts the Uniformity Clause has been recognized as reflecting more stringent limitations. *See, e.g., Downingtown Area Sch. Dist. v. Chester Cnty. Bd. of Assessment Appeals*, 590 Pa. 459, 469 n. 9, 913 A.2d 194, 201 n. 9 (2006). We do not foreclose the possibility that the Uniformity Clause provides greater protections in other ways as well, based on a developed analysis of its text, history, and meaning. Here, however, the parties have not provided such an analysis.

sons are treated alike. *See Small v. Horn,* 554 Pa. 600, 615, 722 A.2d 664, 672 (1998) (Equal Protection Clause); *Leonard v. Thornburgh,* 507 Pa. 317, 321, 489 A.2d 1349, 1352 (1985) (Uniformity Clause). Thus, when the Legislature makes a classification in levying a tax, it will survive scrutiny so long as there is some reasonable justification for treating the relevant group of taxpayers differently than others. *See id.* Indeed, the Legislature has wide discretion in matters of taxation, *see Clifton,* 600 Pa. at 685, 969 A.2d at 1211, and a taxpayer pursuing a Uniformity Clause challenge has the burden of demonstrating that the classification is unreasonable. *See Devlin v. City of Phila.,* 580 Pa. 564, 588, 862 A.2d 1234, 1249 (2004); *see also Wilson Partners, L.P. v. Bd. of Fin. & Revenue,* 558 Pa. 462, 471, 737 A.2d 1215, 1220 (1999) ("When challenging a taxing statute, it is the taxpayer's burden to demonstrate, not only that the enactment results in some form of classification, but also that such classification is unreasonable, in that it is not rationally related to any legitimate state purpose.").

Because Act 50 directed the transfer of $100 million from the MCARE Fund to the General Fund in an effort to balance the state budget, Appellees make a colorable argument that that money was, in effect, converted into tax revenue. Nevertheless, even if we assume, without deciding, that the $100 million diversion amounted, in practical effect, to a tax on health care providers, it does not follow that the Uniformity Clause has been offended. This is because, as noted, taxing classifications are constitutionally permissible if they are reasonable. In light of our disposition of Appellees' due process claim, there remains an outstanding question of whether the $100 million constituted a surplus. If it did, then that in itself will supply an adequate basis for the legislative treatment of such money differently from the fees paid by other Pennsylvania citizens, particularly in light of the contribution from sources other than provider assessments. Therefore, at the present juncture, Appellees' uniformity theory cannot supply an independent justification for affirmance.

## IV. Conclusion

Accordingly, the Commonwealth Court's order granting summary relief to Appellees is reversed and the matter is remanded for further proceedings.

Former Justice ORIE MELVIN did not participate in the decision of this case.

Chief Justice CASTILLE and Justices EAKIN and McCAFFERY join the opinion.

Justice BAER files a dissenting opinion.

Justice TODD files a dissenting opinion.

Justice BAER, dissenting.

The Pennsylvania Medical Society and Hospital & Health-system Association of Pennsylvania ("Appellees") began this action against the Department of Insurance and the Office of the Budget (collectively, "Commonwealth Parties") by filing petitions for review under the Medical Care Availability and Reduction of Error Act ("MCARE Act" or the "Act"), 40 P.S. § 1303.101 *et seq.*, seeking a declaration that the transfer of $100 million from the Medical Care Availability and Reduction of Error Fund ("MCARE Fund" or the "Fund") to the Commonwealth's General Fund impaired Appellees' vested right in having existing MCARE Fund monies used exclusively for MCARE purposes, such that their right could not be infringed by the legislation directing the transfer. Appellees grounded their assertion of vested rights on the Due Process and Remedies Clauses. *See* U.S. CONST. amend. XIV; PA. CONST. art. I, §§ 1, 9; and PA. CONST. art. I, § 11. The Majority appears to credit Appellees' argument that the nature of the MCARE Act created a vested entitlement to have the money in the Fund utilized in the manner directed by statute. The Majority also, however, holds that Appellees' vested rights are immaterial if the money transferred from the Fund represented a surplus, deems the existence of a surplus to be a material fact in dispute, and remands for factual development in this regard. Because I believe that

Appellees have demonstrated that they have a constitutionally protected vested right to the monies in the MCARE Fund irrespective of whether there was a surplus, I would conclude that under the Remedies Clause, the transfer of monies out of the Fund unconstitutionally impaired that vested right. Accordingly, I dissent from the Majority's remand.

Preliminarily, I note my agreement with Sections I and II of the Majority opinion. My disagreement is solely with Section III(A), addressing the merits of Appellees' vested rights argument, and Section IV, remanding on the basis of the Majority's analysis of this argument. Consequently, I would not reach Appellees' tax uniformity argument, which the Majority addresses in Section III(B).

As the Majority correctly observes, the MCARE Act created the MCARE Fund as a "special fund" in the Commonwealth's Treasury, which is administered by the Pennsylvania Department of Insurance and which pays damages awarded in medical professional actions in excess of the primary professional liability insurance MCARE requires that health care providers maintain. 40 P.S. §§ 1303.713(a), 1303.712(a). To be licensed to practice medicine in Pennsylvania, providers must maintain both private professional liability insurance and contribute to the MCARE Fund via annual assessments. *Id.* § 1303.712(d). When the Insurance Commissioner determines the private insurance market has the capacity to handle the professional liability requirements of health care providers, the MCARE Fund will, within a specified period from that determination, cease providing coverage and terminate. *Id.* §§ 1303.711(d)(3)-(4), 1303.712(c)(2). At that time, once all of the Fund's liabilities are satisfied, any money remaining in the Fund will be distributed to those health care providers who contributed to the Fund in the year preceding the distribution. *Id.* § 1303.712(k) ("Any balance remaining in the fund upon such termination shall be returned by the department to the participating health care providers who participated in the fund in proportion to their assessments in the preceding calendar year.").

Appellees' vested rights argument, which the Majority rejects, is that these provisions of the MCARE Act created a vested right in physicians and hospitals in the MCARE Fund. They argue that Section 712 demonstrates that the creation of the MCARE Fund was the result of a legislative bargain that requires all money in the Fund to be used for MCARE purposes, 40 P.S. § 1303.712(a), requires participating health care providers to pay assessments into the MCARE Fund in order to be licensed, *id.* § 1303.712(d), and mandates the return of the balance of the Fund to participating health care providers who paid assessments the year prior to termination, *id.* § 1303.712(k).

The legal foundation for Appellees' vested rights argument is twofold: the Remedies Clause of the Pennsylvania Constitution, *see* PA. CONST. art. 1, § 11, and the Due Process Clauses of the Federal and Pennsylvania and Constitutions, *see* U.S. CONST. amend. XIV, PA. CONST. art. I, §§ 1, 9. As the Majority notes, these concepts are intertwined. The Majority chooses to address Appellees' argument in terms of due process rather than the Remedies Clause because we have often considered the Remedies Clause as being directed to protecting accrued causes of action and defenses, and Appellees do not contend that they have a cause of action that has been undermined by legislative action. Although the Majority is correct that we have considered the Remedies Clause as protecting accrued causes of action and defenses, I am persuaded by Appellees' argument that under these circumstances, a statutory guarantee can similarly be protected as a vested right.

The Remedies Clause guards and protects vested rights. *See* PA. CONST. art. 1, § 11 ("All courts shall be open; and every man for an injury done him in his lands, goods, person or reputation shall have remedy by due course of law, and right and justice administered without sale, denial or delay."). Consequently, the law cannot retroactively impinge vested rights. *See Konidaris v. Portnoff Law Assoc.,* 598 Pa. 55, 953 A.2d 1231, 1241 (2008); *Menges v. Dentler,* 33 Pa. 495, 1859 WL 8742, at *4 (Pa.1859) ("The law which gives character to a case, and by which it is to be decided (excluding the forms of

coming to a decision), is the law that is inherent in the case, and constitutes part of it when it arises as a complete transaction between the parties. If this law be changed or annulled, the case is changed, and justice denied, and the due course of law violated."). *See also Krenzelak v. Krenzelak,* 503 Pa. 373, 469 A.2d 987, 991 (1983) ("Traditionally, retrospective laws which have been deemed reasonable are those which 'impair no contract and disturb no vested right, but only vary remedies, cure defects in proceedings otherwise fair, and do not vary existing obligations contrary to their situation when entered into and when prosecuted.' "); *Gibson v. Commonwealth,* 490 Pa. 156, 415 A.2d 80 (1980) (holding that the reinstatement of sovereign immunity cannot be applied to accrued causes of action); *Lewis v. Pennsylvania R.R. Co.,* 220 Pa. 317, 69 A. 821 (1908) (refusing to apply retroactive legislation that reduced a defendant's defenses or exemptions from demands based on the concept of a vested right); *Kay v. The Pennsylvania R.R. Co.,* 65 Pa. 269, 1870 WL 8539 (Pa. 1870) (refusing to apply a statutory limit on tort recovery retroactively to a cause of action that accrued prior to the passage of the statute).

Based on this concept of vested rights, I agree with the Commonwealth Court and Appellees that the statutory guarantee created by the MCARE Act accrued in Appellees a vested right to have monies in the MCARE Fund used for MCARE purposes. The passage of the MCARE Act reflected a legislative compromise resulting from concern for health care providers and victims of medical malpractice in the Commonwealth. In exchange for health care providers funding the MCARE Fund through their assessments, 40 P.S. § 1303.712(d), Pennsylvania assured access to affordable and reasonable professional liability coverage, *see* 40 P.S. § 1303.102, and, in furtherance of this objective, the MCARE Fund would be used exclusively to pay covered claims against participating health care providers, 40 P.S. § 1303.712(a); would be augmented by public money, 40 P.S. § 1303.712(m); and any excess funds would be returned to the health care

providers who paid assessments the preceding year upon the termination of the Fund, 40 P.S. § 1303.712(k).

Specifically, under Section 711(d), health care providers are, with certain exceptions, required to maintain minimum medical professional liability coverage and, under Section 712(d), to pay assessments into the MCARE Fund based upon the prevailing primary premium for each participating health care provider. Because providers have paid the required assessments into the MCARE Fund, the Fund has been able not only to pay all covered claims and otherwise meet its obligations, but also accumulated the $100 million surplus. This balance is comprised primarily of assessments from the health care providers in accord with the statutory funding formula in Section 712(d)(1), and accumulated under the legal compulsion that, absent formal participation, health care providers could not practice medicine in Pennsylvania. When the providers made contributions to the Fund via assessments pursuant to Section 712(d), the law afforded them the right to have the monies in the Fund used for specific purposes or returned to them upon termination. The balance in the Fund that was depleted by the 2009 budget legislation was the accumulation of these assessments. Indeed, between 2002 and 2008, health care providers paid nearly $1.5 billion in assessments to the MCARE Fund for its administration and for the medical professional liability coverage this special fund was created to provide.

Additionally, the statutory language of Section 712(a) defining the purpose of the MCARE Fund is phrased in mandatory terms: "Money in the fund *shall be used* to pay claims against participating health care providers for losses or damages awarded in medical professional liability actions" within the Fund's coverage, to pay liabilities assumed from its predecessor, and for the administration of the Fund. 40 P.S. § 1303.712(a) (emphasis added). The Fund was created for this sole and exclusive purpose; it was never intended to be a source of general funding for the Commonwealth to deplete or use at will. At the time health care providers paid the assessments that resulted in the Fund's balance, the law

granted them the right to have those assessments used exclusively for the benefit of the Fund, not as the Commonwealth might otherwise provide in the future.[1] The Commonwealth had the concomitant obligation to utilize the monies in the Fund in accord with the statutory purpose, which arose simultaneously with the inverse protection that the General Fund would not be subject to the MCARE Fund liabilities. 40 P.S. § 1303.712($l$ ).

Moreover, any money remaining in the Fund upon termination is the property of certain health care providers. Section 712(k), also part of the MCARE Act since its inception, gave participating health care providers a vested right in the balance of the fund by mandating its return upon the Fund's termination to those providers who paid assessments the preceding year. 40 P.S. § 1303.712(k). This right is more than a mere expectation contingent on a future event; it is directly set forth in the statute. By stating unequivocally that health care providers are entitled to any remaining balance in the MCARE Fund upon termination, the MCARE Act granted a vested right in the balance of the Fund.

The language of the Act, particularly Section 712(a), (d), and (k), guaranteed that, for the life of the Fund, money therein was to be used solely for statutory purposes or returned to contributing providers thereafter without any statutory provision providing for the diversion of assessment funds to the Commonwealth's General Fund. All of these provisions created in the Commonwealth the obligation to preserve the Fund

1. In this regard I observe, as the Majority Opinion and the Dissenting Opinion by Madame Justice Todd have done, that the Commonwealth Court has recently decided that the statutory assessment formula, 40 P.S. § 1303.712(d)(1), implicitly accounts for any surplus in the fund, and that any assessment calculation must, therefore, include any unspent balances from the prior year. *See Hosp. & Healthsystem Ass'n v. Ins. Comm'r of Pa.*, 74 A.3d 1108, 2013 WL 4033850. While I take no position on the propriety of this decision as review has been sought in the case, I view it as supportive of my position that any balance or surplus remaining in the Fund must be used for the benefit of the Fund and the health care providers, by reducing the assessments they are required to pay into the Fund and being returned to them upon dissolution of the Fund, rather than as a source of general budgetary revenue.

for MCARE purposes and to use it in accord with the narrow provisions of the Act. Appellees' right to have the assessment balance in the Fund used for MCARE purposes is vested. It is more than a mere expectation, and rises to the level of an accrued cause of action which cannot be infringed by the 2009 budget legislation. *See Konidaris,* 953 A.2d at 1242 (describing vested rights as follows: "It must be something more than a mere expectation, based upon an anticipated continuance of existing law. It must have become a title, legal or equitable, to the present or future enforcement of a demand, or a legal exemption from a demand made by another.").

The Commonwealth's power to alter the entitlements that attach to completed transactions is limited by the constitutional protection afforded to vested rights. *Ieropoli v. AC & S Corp.,* 577 Pa. 138, 842 A.2d 919, 930 (2004); *Menges,* 33 Pa. 495, 1859 WL 8742, at *4. "This doctrine reflects the deeply rooted principles that persons should be able to rely on the law as it exists and plan their conduct accordingly and that the legal rights and obligations that attach to completed transactions should not be disturbed." *Alliance of American Insurers v. Chu,* 77 N.Y.2d 573, 569 N.Y.S.2d 364, 571 N.E.2d 672, 678 (1991) (citation omitted). The payment of assessments into the Fund under the statutory framework of the MCARE Act and the resulting accumulation of a positive balance represent a completed transaction; the legal rights and obligations that attach to the treatment of the surplus must align with the law as it existed when the balance accrued. The nature of the obligations explicitly undertaken by the Department of Insurance with respect to the Fund and the reasonable expectations of the participating health care providers created by the statutory scheme pursuant to which they made their contributions did not contemplate the diversion of funds for general revenue purposes. While the legislature may be able to amend the MCARE Act prospectively, it cannot retrospectively seize money already in the MCARE Fund at the time of the 2009 budget legislation.

I would therefore conclude that the participating health care providers' vested right to the use of MCARE Funds for

MCARE purposes and to the balance of the MCARE Fund that accumulated under the law granting those rights may not be extinguished by subsequent legislation, and that by diverting the $100 million from the MCARE Fund pursuant to the 2009 budget legislation, the Commonwealth impinged the health care providers' right to have money in the Fund used for Fund purposes or returned to them upon termination. The 2009 budget legislation retroactively changed the conditions affecting assessments already paid and presently eliminated the health care providers' vested right in the accumulated surplus. Thus, I would hold that the 2009 budget legislation, with respect to the $100 million transfer, is invalid.[2]

The Majority recognizes that the transfer of monies from the MCARE Fund to the General Fund is retrospective in

**2.** Although not binding, I find the reasoning of the following cases supportive of Appellees' position: *Wisconsin Med. Soc'y, Inc. v. Morgan,* 328 Wis.2d 469, 787 N.W.2d 22 (2010); *Tuttle v. New Hampshire Med. Malpractice Joint Underwriting Ass'n,* 159 N.H. 627, 992 A.2d 624 (2010); *Alliance of Am. Insurers v. Chu,* 77 N.Y.2d 573, 569 N.Y.S.2d 364, 571 N.E.2d 672 (1991). Although each of these cases presents factual and legal distinctions, they represent the reasoned opinions of their respective state's highest court holding that the legislature cannot grant rights and then, once those rights have accrued, take them away retroactively. *See Morgan,* 787 N.W.2d 22 (holding that where the Injured Patients and Families Compensation Fund was funded by annual assessments on physicians in exchange for excess medical liability coverage, the physicians had a vested right in the fund's surplus because it would either be returned to them in the form of lower assessments or reinvested for the fund's future security); *Tuttle,* 992 A.2d 624 (holding that where policyholders funded the Medical Malpractice Joint Underwriting Association with premium payments to provide coverage to all health care providers and accumulated a surplus which was statutorily required to be used to reduce payments or be distributed to policyholders, the transfer of that surplus from its intended purpose violated the policyholders' contractual rights), *Chu,* 569 N.Y.S.2d 364, 571 N.E.2d 672 (holding that where insurers made contributions to the Property/Casualty Guaranty Fund when the law granted them the right to the income earned on those contributions and provided assurances that the contributions would be used only for the benefit of the fund, including the promise to keep the fund separate from other state monies, the contributions did not become state money to do with as the state wished but created in the state obligations to preserve the fund and to use its assets and earnings only for the narrow purposes set forth).

nature because it attaches new legal consequences to assess-ments providers paid into the Fund in reliance on the MCARE Act, therefore raising due process concerns regard-ing the infringement of vested rights, and that providers retained a vested entitlement to have money in the Fund utilized in a manner directed by the Act. Maj. Op. at 285–88, 77 A.3d at 604–06. The Majority holds, however, that whether the contested $100 million represented a surplus in the Fund is a fact that is material to the outcome of Appellees' due process/vested rights argument. Maj. Op. at 289, 77 A.3d at 604–05 (citing *Washington, D.C. Ass'n of Realtors, Inc. v. District of Columbia,* 44 A.3d 299, 305 (D.C.2012); 81A C.J.S. *States* § 387 (2012); *Daugherty v. Riley,* 1 Cal.2d 298, 34 P.2d 1005 (1934)). I am not persuaded by the Majority's legal analysis in this regard.

Respectfully, I find no support for the Majority's holding that the legislature retains authority to transfer any surplus of monies protected by vested entitlements. The Majority cites *Washington, D.C. Ass'n of Realtors,* 44 A.3d 299, *Daugherty,* 34 P.2d 1005, and 81A C.J.S. *States* § 387 (2012) (relying on *Flynn v. Department of Admin.,* 216 Wis.2d 521, 576 N.W.2d 245 (1998)) in support of its argument. In my view, none are materially helpful. In *Washington, D.C. Ass'n of Realtors,* 44 A.3d at 303, although the court recognized that the legisla-ture's authority to direct the transfer of monies from the disputed special fund to the general fund could be answered by determining whether the transfer would "contravene a specific constitutional provision controlling the fund or breach a contractual obligation," *id.,* 44 A.3d at 305, the argument did not concern the assertion of constitutionally protected rights and was instead premised on an alleged violation of the Home Rule Act, D.C.Code §§ 1–201.01–1–207.71 (2001). In contrast, Appellees' argument herein is premised on their constitution-ally protected vested right to monies in the MCARE Fund.

Similarly, in *Flynn v. Department of Admin.,* 216 Wis.2d 521, 576 N.W.2d 245 (1998), which is the primary source from which the Majority's authority is derived, *see* Maj. Op. at 288–89, 77 A.3d at 605 (citing 81A C.J.S. *States* § 387 (2012)), the disputed money was paid by court users as filing fees into the

general fund with a portion credited to a court automation program. At the statutorily established termination of the program, the court automation appropriation carried a positive balance, and the legislature sought to utilize the balance for another purpose. The court validated the legislature's decision and rejected an argument that the legislative action violated public policy. Notably, there was no vested rights argument by a group of individuals who paid into the fund based on an express guarantee that they would receive the benefit of the fund and its surplus. Nor did the statute at issue contain any provision addressing a surplus, as the MCARE Act does at Section 1303.712(k).

Finally, in *Daugherty,* the California Supreme Court stated that although the legislature may utilize a surplus that exists in a special fund, if it transfers money from such a fund to the general fund, it is a loan that the legislature is required to repay to the special fund:

> What has been said is not to deny power upon the part of the Legislature to transfer a special fund reserve temporarily from one purpose to another under the authority of ... the Political Code or other authority to like effect. But when these diversions are made the transfers are under the section deemed a loan from the special fund to be returned to that fund as soon as funds are available. This right of transfer established by [the Political Code] is specifically declared not to warrant the transfer of any money from any fund so as to interfere in any manner with the objects for which such fund was created.

34 P.2d at 1010. The court therefore held that the legislature could not establish a fund for one purpose, assess fees for that purpose, then permanently divert that money for a foreign purpose. *Id.* at 1011.

I am therefore unable to agree with the Majority that it is relevant whether the transferred funds represented a surplus, particularly considering that the distribution of the reserves upon the Fund's termination in accord with Section 712(k) precludes the possibility of such reserves being characterized as a surplus. I would instead accept Appellees' vested rights

argument and affirm the Commonwealth Court. Therefore, I respectfully dissent.

Justice TODD, dissenting.

I would hold our decision pending a final order in *Hosp. & Healthsystem Ass'n v. Ins. Comm'r of Pa.*, 74 A.3d 1108, 2013 WL 4033850 (Pa.Cmwlth. filed Aug. 9, 2013) (hereinafter *"Hosp. & Healthsystem "*)—for which appeal has been sought to this Court [1]—because I find my resolution of this appeal is contingent on a final determination in that litigation. Accordingly, I respectfully dissent.

## I. The Commonwealth Court's Decision in *Hosp. & Healthsystem*

As the majority alludes to, *see* Majority Opinion at 290 n. 24, 77 A.3d at 606 n. 24, in *Hosp. & Healthsystem,* the Commonwealth Court recently construed Section 712(d)(1) of the MCARE Act, the provision which determines the aggregate dollar amount of the assessments to be levied on health care providers in a given year. Therein, the healthcare providers asserted they were overcharged assessments in 2009, 2010, and 2011.[2] Section 712(d)(1) provides that the assessment "shall, in the aggregate, produce an amount sufficient to do all of the following:" (i) reimburse the MCARE Fund for claims paid out the prior year; (ii) pay expenses of the Fund for the prior year; (iii) pay principal and interest to cover loans made to the Fund the prior year, if there was a shortfall; and (iv) provide a reserve equaling 10% of the sum of (i), (ii), and (iii). 40 P.S. § 1303.712(d)(1). At issue in that case was the meaning of the preamble—that the assessment *shall, in the aggregate, produce an amount sufficient to do* (i) through (iv)—and, specifically, whether that calculation includes any surplus monies remaining in the Fund from the prior year. The healthcare providers asserted the aggregate assessment calculation

1. The Insurance Commissioner filed a petition for allowance of appeal in this Court on September 9, 2013. *Hosp. & Healthsystem Ass'n v. Ins. Comm'r of Pa.*, 681 MAL 2013. That petition is pending.

2. Notably, the $100 million transfer authorized by Act 50, at issue in the instant case, occurred during this period, in 2009.

must account for any surplus, while the Insurance Commissioner took the position that the assessment is unrelated to the balance in the Fund.[3]

The court concluded the assessment calculation must include any unspent balances from the prior year. First, the court observed that the statute used the phrase "produce an amount sufficient to" cover the sum of (i) through (iv), not an amount *equal to* that sum. *Hosp. & Healthsystem*, 74 A.3d at 1114–15, 2013 WL 4033850 at *5. Second, the court reasoned:

> Most importantly, the MCARE Act says nothing about the accumulation of unspent balances in excess of the 10% reserve. It does not authorize them. Accordingly, it provides no direction on when and how to use them. Likewise, the MCARE Act provides no guidance on the income generated by an accumulation of unspent balances, which can be considerable given the present unspent balance of $104 million. The MCARE Act's silence on these matters makes perfect sense only if the legislature never intended that such an accumulation would develop.

*Hosp. & Healthsystem*, 74 A.3d at 1114–15, 2013 WL 4033850 at *5. Finally, the court noted the operation of Section 712(k) of the Act, which directs the return of Fund balances upon the Fund's termination at some point in the future when it has satisfied all liabilities:

> The legislature has addressed the possibility of an unspent balance in only one place in the statute. Section 712(k) of the MCARE Act provides that upon termination of the MCARE Fund, "[a]ny balance remaining in the fund"

3. The court provided the following illustration, based on a stipulation of the parties regarding the 2009 assessment. Therein, the MCARE Fund calculated the 2009 aggregate assessment to be approximately $204 million. *Hosp. & Healthsystem*, 74 A.3d at 1112–13, 2013 WL 4033850 at *3. This consisted of a total of: $174 million in claims from 2008; plus expenses of $12 million in 2008; plus $0 for 2008 loans; plus $18.6 million, representing 10% of the sum of $174 million and $12 million. *Id.* The Fund *ignored* the 2008 unspent balance of approximately $104 million. *Id.* According to the court, had the Fund taken the $104 million into account, "the assessments would have been significantly lower." *Id.* Presumably, the adjusted levy in 2009 would have been $100 million: $204 million minus the $104 million surplus.

shall be returned to the healthcare providers who paid "assessments *in the preceding calendar year.*" 40 P.S. § 1303.712(k) (emphasis added). The very wording of this directive is instructive. It presumes a small, if "any," balance and suggests that there should not be an unspent balance in any other year. Were it otherwise, the legislature would have directed the return of accumulated unspent balances to all the providers who, in preceding years, contributed to the accumulated unspent balances lest the providers in the final year enjoy a windfall.

*Hosp. & Healthsystem,* 74 A.3d at 1114–16, 2013 WL 4033850 at *5–6.[4] As a result of its determination, the court ordered reassessments for 2009, 2010, and 2011, directing the Fund to take into account any unspent balances in calculating the aggregate assessment for each of those years.

In my view, if the Commonwealth Court's interpretation of Section 712(d)(1) in *Hosp. & Healthsystem* is correct, an interpretation the Insurance Commissioner is challenging before this Court, the effect is twofold: First, any monies withdrawn from the Fund—for example, the $100 million transfer out of the Fund accomplished by Act 50—are unavailable to offset the imposed aggregate assessment for the following year, thus resulting in proportionately higher assessments for the healthcare providers in that assessment year. Second, as a corollary, there will be no year-to-year surplus in the fund, as any excess created in a given year (generated when the 10% reserve required by Section 712(d)(1)(iv) is not needed to cover claims) will be returned to healthcare providers by way of lower assessments in the next year.

The Commonwealth Court's determination, which is directly contrary to the Commonwealth's contention herein, *see, e.g.,* Commonwealth's Brief at 36–37 ("the assessment level is entirely independent of the balance in the MCARE Fund"), has ripple effects throughout the present appeal, both on my

4. The court also concluded that any contrary interpretation would be constitutionally infirm because Section 712(d) does not give the MCARE Fund any direction on how to use unspent balances, and, thus, would be an unconstitutional delegation of legislative power. *Id.* at 1115–16, 2013 WL 4033850 at *6.

resolution of the question of Appellees' standing, as well as the merits.

## II. Standing [5]

In Pennsylvania, the requirement of standing stems from the principle that a court's intervention is appropriate only where the underlying controversy is real and concrete, and not abstract. *City of Philadelphia,* 575 Pa. at 559, 838 A.2d at 577. We have observed that the requirement "is not a senseless restriction on the utilization of judicial resources," but, rather, is "a prudential, judicially-created tool meant to winnow out those matters in which the litigants have no direct

5. In addition to standing and political question, this case presents an additional threshold issue not addressed by the majority. That issue—whether the General Assembly is an indispensable party—was identified in the Commonwealth Court by Judge Pellegrini in his dissent, and was noted, but not resolved, by the majority herein. *See* Majority Opinion at 272–73, 77 A.3d at 595. Specifically, Judge Pellegrini opined that the General Assembly, not joined in this action, is an indispensable party because the relief Appellees seek requires the passage of budget legislation to transfer $100 million from the General Fund back to the MCARE Fund. *See Hosp. & Healthsystem Ass'n of Pennsylvania,* 997 A.2d 392, 403 (Pa.Cmwlth.2010) (*en banc* ) (Pellegrini, J., dissenting) (incorporating and citing *Pennsylvania Med. Soc'y v. Dep't of Public Welfare,* 994 A.2d 33, 46–53 (Pa.Cmwlth.2010) (Pellegrini, J., dissenting)).

As the issue regarding the General Assembly's status as an indispensable party implicates the Court's jurisdiction, in my view, that threshold issue should have been resolved before Appellees' claim was addressed on the merits. *See City of Philadelphia v. Commonwealth,* 575 Pa. 542, 572, 838 A.2d 566, 584–85 (2003) (after ruling that petitioners had standing and the question they presented was justiciable, and before awarding relief, resolving that the General Assembly was not an indispensable party, such that the court had jurisdiction to reach the merits).

Further, in declining to address the issue, I question the majority's reliance on the Commonwealth's representation during preliminary injunction proceedings below that it would comply with the Commonwealth Court's ultimate judgment. *See* Majority Opinion at 274 n. 9, 77 A.3d at 596 n. 9. This approach, in my view, pays insufficient regard to the constitutional rule that this Court "has only that jurisdiction as is provided by law," and is tantamount to allowing parties to confer jurisdiction on the Court, which cannot be permitted. *See In re Nader,* 588 Pa. 450, 461, 905 A.2d 450, 457 (2006) (internal quotation marks omitted); *id.* ("The fact that Appellees in the instant matter agreed that the Order was appealable cannot confer jurisdiction on the Court if it is otherwise lacking."); *see also* Pa. Const. art. V, § 2(c). Given my determination that we should hold our present disposition of this matter, however, I do not address this issue any further.

interest" and to ensure that there is a legitimate controversy for a court to hear. *In re Hickson*, 573 Pa. 127, 135, 821 A.2d 1238, 1243 (2003).

Thus, in practical terms, our standing doctrine is founded on the core concept that a party must be "aggrieved," *i.e.*, "adversely affected," by the matter he seeks to challenge in order to obtain a judicial resolution of his claim. *William Penn Parking Garage v. City of Pittsburgh*, 464 Pa. 168, 192, 346 A.2d 269, 281–82 (1975). As we have stated, the "keystone to standing . . . is that a person must be negatively impacted in some real and direct fashion." *Pittsburgh Palisades Park, LLC v. Commonwealth*, 585 Pa. 196, 204, 888 A.2d 655, 660 (2005).

Under the test we have devised, a litigant may establish he is aggrieved, and thus, has standing, by stating facts that show he has a "substantial, direct, and immediate" interest in the outcome of the litigation. *Id.* A party's interest is "substantial" if "his interest exceeds that of all citizens in procuring obedience to the law." *City of Philadelphia*, 575 Pa. at 560, 838 A.2d at 577. His interest is "direct if there is a causal connection between the asserted violation and the harm complained of." *Id.* His interest is "immediate" if that causal connection is neither "speculative" nor "remote." *Id.* In applying this test, we have noted that Pennsylvania law does not support the proposition that harms which are "abstract or uncertain" are sufficient to confer standing. *Id.*

While I would agree with the majority that Appellees' interest is substantial, I cannot agree at this juncture that Appellees also have demonstrated a direct and immediate interest. In that regard, the majority accepts Appellees' assertion that the unavailability of $100 million in the MCARE Fund resulting from the 2009 transfer of fund monies harmed them and establishes their direct and immediate interest. The majority concludes this is so because, *inter alia*, "the transfer of funds is the direct and immediate cause of the alleged infringement of Appellees' vested entitlements, as well as the alleged non-uniform taxation." Majority Opinion at 280, 77 A.3d at 599. I cannot agree, as, in my view, Appellees must

more concretely demonstrate that they are harmed by the $100 million transfer. *Cf. Pittsburgh Palisades,* 585 Pa. at 204, 888 A.2d at 660 (negative impact must be real, not remote). However, *if* the $100 million transfer resulted in an increase in Appellees' assessments, I conclude that *would* be a sufficient demonstration of harm. As the correctness of the Commonwealth Court decision in *Hosp. & Healthsystem* bears directly on this question, I cannot resolve the standing question absent a final judgment in that case.[6]

## III. Merits

Although my standing analysis is contingent on the Commonwealth Court's decision in *Hosp. & Healthsystem,* that decision likewise bears on my analysis of the merits of this appeal.

### A. Vested Rights

I am skeptical of the majority's conclusion that Appellees had a vested right to the monies in the MCARE Fund because the fund "is in the nature of a trust fund whose monies are held for the purpose designated by statute." Majority Opinion at 287, 77 A.3d at 604. The legislature expressly established the MCARE Fund as a "special fund" within the State Treasury, indicating that money in the Fund, which comes from assessments and other sources,[7] would remain under the

6. This analysis follows to a degree this Court's determination in *Pennsylvania Med. Soc. v. Dep't of Pub. Welfare,* 614 Pa. 574, 39 A.3d 267 (2012), that Appellees had standing to sue. There, the Court concluded that, since Appellees demonstrated they would pay increased health care provider MCARE assessments in the future as a result of the Commonwealth's failure to fund all MCARE abatements under the Health Care Provider Retention Law ("Abatement Law"), 40 P.S. §§ 1303.1101–1115 (repealed in 2009), they sustained ascertainable harm and thereby established a direct and immediate interest in the claim they brought. 39 A.3d at 279.

7. The record establishes that, between 2002 and 2008, the MCARE Fund received $330 million in transfers from the Health Care Provider Account under the Abatement Law (repealed in 2009), which was derived from general tax revenue on the sale of cigarettes, and more than $215 million derived from motor vehicle violation surcharges under Section 712(m) of the MCARE Act. *See* 40 P.S. § 1303.712(m) (repealed in June 2011).

General Assembly's budgetary control and be subject to its legislative mandates.[8] *See* 40 P.S. § 1303.712(a). Indeed, since it can be presumed that the legislature knew how to place monies in trust and restrict their use, had the General Assembly intended that the monies in the MCARE Fund be used exclusively for MCARE purposes and for nothing else, it would have established the Fund differently, in the form of a trust, as it did when creating the Fund's predecessor, and it would have imposed express restrictions in the MCARE Act on its authority to control the uses to which Fund monies may be put, as it has in other statutes. *See* 40 P.S. 1301.701(e)(8) (repealed 2002) ("The [Medical Professional Liability Catastrophe Loss] fund and all income from the fund shall be held in trust, deposited in a segregated account ... and shall not become a part of the General Fund of the Commonwealth."); 66 Pa.C.S.A. § 511(b) ("All such [annual] assessments and fees [collected from public utilities for defraying the regulatory

8. In Pennsylvania, the term "special fund" is a technical term and has acquired a particular meaning. *See* 1 Pa.C.S.A. § 1903 ("[T]echnical words and phrases and such others as have acquired a peculiar and appropriate meaning ... shall be construed according to such peculiar and appropriate meaning or definition."). The Governor's Office Manual of Accounting (the "Manual"), adopted as the official accounting procedures document by the Commonwealth for Commonwealth agencies, which the parties here acknowledge, classifies and defines the various Commonwealth funds that may be established by legislative or administrative action. The Manual states, in pertinent part:

 b. Special Revenue Funds. Special revenue funds account for transactions related to resources obtained from specific revenue sources (other than for expendable trusts or major capital projects) that are legally restricted to expenditures for specified purposes. Special revenue funds account for federal grant programs, taxes levied with statutorily defined distributions, and other resources restricted as to purpose. The Commonwealth has over 50 such funds.

 Special revenue funds, as with the General Fund, are subject to budgetary control. Controls derive from legislative mandate, as is the case with the State Lottery Fund and the Motor License Fund, or by direction of the Governor.

 The Manual (Exhibit A to Petitioner's Reply Brief in Support of Application for Summary Relief) at 32. By contrast, under the Manual, "fiduciary fund types," classified as "Expendable Trust Funds," "Nonexpendable Trust Funds," "Pension Trust Funds," or "Agency Funds," are "held by the Commonwealth as a trustee or agent for some other entity or for itself." *Id.* at 32–33.

costs of the Public Utility Commission] shall be held in trust solely for that purpose, and shall be earmarked for the use of, and annually appropriated to, the commission for disbursement solely for that purpose.").

Regardless, I cannot join the majority's decision to remand this matter to the Commonwealth Court for a determination of whether a surplus exists in the Fund. As discussed above, in my view, that court has already determined in *Hosp. & Healthsystem* that the assessment mechanism provided in Section 712(d)(1) of the MCARE Act contemplates there will be no surplus from year to year. Instead of a remand, I would hold the present appeal pending a final determination in *Hosp. & Healthsystem*.

### B. Uniformity Clause

Like the majority, I would assume for present purposes that "the $100 million diversion amounted, in practical effect, to a tax on health care providers," Majority Opinion at 292, 77 A.3d at 607, implicating Appellees' claim that the transfer was a violation of the Uniformity Clause. However, unlike the majority, I would not remand the issue to the Commonwealth Court for a determination of whether Act 50's transfer of $100 million was from surplus monies. Again, in my view, that court has already decided that the assessment formula leaves no surplus. Furthermore, if the Commonwealth Court's analysis in *Hosp. & Healthsystem* is correct, there would appear to be a direct correlation between the $100 million transferred out of the fund by Act 50 and an increase in the aggregate assessment on Appellees the following year. This would indicate, consistent with Appellees' argument, that Appellees' resulting assessment was, in fact, a general revenue tax. Accordingly, rather than remand the question to a court that has, in my view, essentially already decided the matter, I would hold our decision pending a final determination in *Hosp. & Healthsystem*.

For all these reasons, I respectfully dissent.